Marc E. Hankin (SBN 170505)
Anooj Patel (SBN 300297)
HANKIN PATENT LAW, APC
12400 Wilshire Boulevard, Suite 1265
Los Angeles, CA 90024
Tel: (310) 979-3600
Fax: (310) 979-3603

John M. Desmarais (SBN 320875)
Karim Z. Oussayef (admitted *pro hac vice*)
Brian D. Matty (admitted *pro hac vice*)
Michael Matulewicz-Crowley (admitted *pro hac vice*)
DESMARAIS LLP
230 Park Avenue
New York, New York 10169
Tel: (212) 351-3400
Fax: (212) 351-3401

*Attorneys for Plaintiff International Business Machines Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ZILLOW GROUP, INC., a Washington Corporation, ZILLOW, INC., a Washington Corporation,<br><br>Defendants. | Case No. 8:19-CV-01777<br><br>**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff International Business Machines Corporation ("IBM"), for its Complaint for Patent Infringement against Zillow Group, Inc. ("Zillow Group") and Zillow, Inc. (collectively "Defendants" or "Zillow"), alleges as follows:

## JURISDICTION AND VENUE

1.    This action arises under 35 U.S.C. § 271 for Defendants' infringement of IBM's United States Patent Nos. 7,072,849 (the "'849 patent"), 7,076,443 (the "'443 patent"), 7,187,389 (the "'389 patent"), 7,631,346 (the "'346 patent"), 8,315,904 (the

1  "'904 patent"), 9,158,789 (the "'789 patent"), and 9,245,183 (the "'183 patent")

2  (collectively, the "Patents-in-Suit").

3      2.    This action arises under the patent laws of the United States, including 35

4  U.S.C. § 271 *et seq*.  The jurisdiction of this Court over the subject matter of this action

5  is proper under 28 U.S.C. §§ 1331 and 1338(a).

6      3.    This Court has personal jurisdiction over Zillow Group and Zillow, Inc.

7  because, among other things: Zillow Group and Zillow, Inc. have a regular and

8  established place of business in this judicial district; Zillow Group and Zillow, Inc. have

9  committed, aided, abetted, contributed to and/or participated in the commission of acts

10 giving rise to this action within the State of California and this judicial district and have

11 established minimum contacts within the forum such that the exercise of jurisdiction

12 over Zillow Group and Zillow, Inc. would not offend traditional notions of fair play and

13 substantial justice; Zillow Group and Zillow, Inc. have placed products and services

14 that practice the claims of the Patents-in-Suit into the stream of commerce with the

15 reasonable expectation and/or knowledge that actual or potential users of such products

16 and/or services were located within this judicial district; and Zillow Group and Zillow,

17 Inc. have sold, advertised, solicited customers, marketed and distributed their services

18 that practice the claims of the Patents-in-Suit in this judicial district.

19     4.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and

20 1400(b), at least because Zillow Group and Zillow, Inc. each have a regular and

21 established place of business in this judicial district and both Zillow Group and Zillow,

22 Inc. have committed, and continue to commit, acts of infringement in this judicial

23 district.

24 **A.    Zillow Has A Regular And Established Place Of Business In This District.**

25     5.    Zillow Group and Zillow, Inc. have a regular and established place of

26 business in this judicial district at 2600 Michelson Drive, Suite 1200, Irvine, CA 92612.

27 The building at 2600 Michelson Drive is marked with Zillow Group's name and logo:

28



Ex. 1 (https://www.loopnet.com/Listing/2600-Michelson-Dr-Irvine-CA/14368559/).

Ex. 2 (https://www.facebook.com/pages/category/Real-Estate-Service/Zillow-Group-Irvine-132635443939887/).

1   The building is also home to Zillow, Inc.[1]   Zillow Group and Zillow, Inc. have

2   approximately 60,074 square feet of office space in Irvine, California.[2]

3        6.    Venue is also proper in this district because Zillow Group and Zillow, Inc.

4   have numerous employees in this judicial district who are responsible for the design,

5   operation, sale, and marketing of the accused website and mobile applications.  Zillow

6   Group and Zillow, Inc.'s technical employees in the district have titles such as: Senior

7   UI Designer, Senior Software Engineer, Software Engineer, Director of Product

8   Development, Full Stack JavaScript Engineer, Senior Software Developer, DevOps

9   Engineer, UI/UX Designer, QA Engineer, Senior Group Manager—Big Data, Senior

10   Software Development Manager, Software Development Engineer, and Product

11   Manager.  Zillow Group and Zillow, Inc.'s technical employees design, develop, and

12   implement the infringing functionalities of the accused website and mobile applications

13   in Irvine, California.  Zillow Group and Zillow, Inc.'s technical employees in this

14   district also have relevant information related to the design, development, and operation

15   of the accused website and mobile applications.

16        7.    In addition to the employees already present in the district, Zillow Group

17   and Zillow, Inc. continue to advertise available job postings in the area, including for

18   the following positions: Senior Principal Machine Learning Engineer—Search,

19   Principal Machine Learning Engineer—Conversational AI, Data Integration Specialist,

20   Senior Front End Engineer, and Senior Software Development Engineer for New

21   Construction Listings.

22        8.    Zillow Group and Zillow, Inc. also have sales and marketing employees

23   who work in the judicial district with titles such as: Sales, Sales Executive, Inside Sales,

24   Senior Account Manager, Agent Care Consultant, and Regional Sales Executive.

25   _____

26   [1] Ex. 3 (http://zillowgroup.mediaroom.com/2012-04-16-Zillow-to-Open-New-Office-
Grow-Sales-Force-In-Orange-County-Calif) (describing 600 Michelson Drive, Irvine,

27   CA 92612 as a Zillow office location).

28   [2] Ex. 4 (Zillow Group 2018 10-K) at 38.

Zillow Group and Zillow, Inc.'s sales and marketing employees located in Irvine, CA are responsible for the sale and marketing of the infringing functionalities of the accused website and mobile applications.[3]   Zillow's Irvine, CA office also includes sales personnel responsible for work related to Zillow Premier Agent and, in particular, "advertising to real estate agents."[4]   Zillow Group and Zillow, Inc.'s sales and marketing employees in the district therefore have relevant information related to demand for the infringing functionality, the marketing of the accused website and mobile applications, and the revenue, costs, and profits of the accused website and mobile applications.

9.      On information and belief, Zillow Group and Zillow, Inc. offer networking and support services from its offices located in the district.   For example, Zillow develops and offers its customer services from its office in Irvine, CA.[5]

10.      Venue is also proper in this district because Zillow Group and Zillow, Inc. own numerous properties that they have purchased through "Zillow Offers."   For example, Zillow Group and Zillow, Inc. have made "Zillow Offers" available in at least Los Angeles County,[6] Orange County,[7] and Riverside County.[8]   As part of "Zillow Offers," Zillow Group and Zillow, Inc. purchase homes directly from home owners, make repairs, and then sell the homes.[9]   For example, Zillow Group and Zillow, Inc. own the properties at 2526 N Whitewater Club Dr., Unit B, Palm Springs, CA 92262 and 101 Englemann Dr., Corona, CA 92881 in Riverside County.

---

[3] *Id.* at 14.
[4] Dkt 34-2 (Declaration of Nate Moch ("Moch Decl.")) ¶ 15.
[5] *Id.* ¶ 11.
[6] Ex. 5 (https://www.latimes.com/business/la-fi-zillow-home-buying-20181211-story.html).
[7] Ex. 6 (https://www.ocregister.com/2019/05/09/zillow-offers-announces-plans-to-expand-ibuying-in-l-a-orange-counties/).
[8] Ex. 5.
[9] Ex. 7 (https://www.zillow.com/offers/) (describing the process for selling a home to Zillow Group and Zillow).



Ex. 8 (https://www.zillow.com/homedetails/2526-N-Whitewater-Club-Dr-UNIT-B-Palm-Springs-CA-92262/82017038_zpid/).



Ex. 9 (https://www.zillow.com/homes/101-Englemann-Dr-Corona,-CA,-92881_rb/54952838_zpid/).

These properties also constitute regular and established places of business in this judicial district.

**B.     Zillow Develops The Infringing Products And Services In This District.**

11.     Zillow Group and Zillow, Inc.'s numerous technical employees in Irvine, CA develop aspects of the infringing website and mobile applications in this district. Zillow Group and Zillow, Inc. have numerous employees in the judicial district who are responsible for the design, and operation of the accused website and mobile applications, including the following employees: Senior UI Designer, Senior Software Engineer, Software Engineer, Director of Product Development, Full Stack JavaScript Engineer, Senior Software Developer, DevOps Engineer, UI/UX Designer, QA Engineer, Senior Group Manager—Big Data, Senior Software Development Manager, Software Development Engineer, and Product Manager.  Further, members of the teams that develop Zillow's website and mobile applications, such as members of Zillow's "artificial intelligence ('AI') team," which is one of the "teams and personnel [] responsible for any potentially relevant Zillow technology"[10] in this case, are located in this judicial district.  For example, Andrei Lopatenko, who is Zillow's Vice President of "Engineering, Search and Conversational AI, AI, Machine learning," and a member of the AI team, posted a job opening for said AI team for Zillow's Irvine office, seeking engineers that "are experienced in and interested to build [] modern query understanding and search ranking stacks [] based on machine learning."[11]  For another example, Andrei Lopatenko posted another job opening stating that "[t]he search team of Zillow Group" is hiring "SR MLE, SR Principal, and Principal roles" to work on "Natural Language

---

[10] Moch Decl. ¶ 3.

[11] Ex. 10 (https://www.linkedin.com/in/lopatenko/detail/recent-activity/shares/).

Processing, Conversational AI and Learning to Rank" in their Irvine office.[12]  The hired employees would "actively work[] on query understanding, ranking and conversational platforms and their business applications."[13]

12.   Further, additional Zillow employees that develop and provide the website and mobile applications are located in this judicial district.  For example, Boaz Brudner is a Senior Group Manager—Big Data in Zillow's Irvine, CA office, and he "[l]ead[s] a group of application developers and data engineers to power Zillow's public data feed.  This feed drives some of Zillow's foundational features such as ***Zestimate and the Home Details Page***."[14]  The "Home Details team" is a part of the "front-end Web Shopping team," which in turn is "involved in the development and maintenance of its consumer-facing website"[15] and thus is responsible for infringing Zillow technology in this case.  Zillow's "generation of 'Zestimates'" is also "relevant to Zillow's alleged infringement of the '183 patent."[16]  For another example, Michael (Shinbo) Wang is Senior Software Development Manager in Zillow's Irvine, CA office and "[m]anag[es] nationwide real-time MLS (Multiple Listing Service) listing intake and downstream web APIs that power listing data for Zillow.com."[17]  For another example, David Stewart is a Software Development Engineer in Zillow's Irvine, CA office, where he "work[s] on the back end of Zillow's data services to bring the most accurate and up-to-date listing information to the Zillow Group."[18]  For another example, Sravya Kotte is a Product Manager in Zillow's Irvine, CA office that works on, among other things, "B2C mobile friendly websites across Zillow, Trulia, and StreetEasy brands."[19]  On

---

[12] Ex. 69 (https://www.linkedin.com/posts/lopatenko_the-search-team-of-zillow-group-started-hiring-activity-6605266210500202496-7Ced).

[13] *Id.*

[14] Ex. 11 (https://www.linkedin.com/in/boazbrudner/).

[15] Moch Decl. ¶ 3.

[16] *Id.* ¶ 7.

[17] Ex. 12 (https://www.linkedin.com/in/shinbowang/).

[18] Ex. 13 (https://www.linkedin.com/in/davidleestewartjr/).

[19] Ex. 14 (https://www.linkedin.com/in/sravyakotte/).

information and belief, "B2C" refers to "Business-to-Consumer," or the consumer-facing website and mobile applications.  For another example, Gideon Williams is a Software Engineer in Zillow's Irvine, CA office, where he, on information and belief, works on and is responsible for at least two GitHub source code repositories that relate to the consumer-facing Zillow website and mobile applications, including the infringing aspects of the consumer-facing Zillow website and mobile applications: ZillowHomeInfo, which is a "[s]imple web app to display info about a home from the Zillow GetSearchResult API" and ChatMagic, which is "[a] Zillow HackWeek project to integrate a chatbot into the Real Estate App that answers questions for Beths and routes highly-qualified leads to Premier Agent Concierge."[20]

13.    Zillow's technical job postings in this judicial district also show that Zillow Group and Zillow, Inc. develop and provide the website and mobile applications in this judicial district.  For example, the "artificial intelligence ('AI') team" is one of the "teams and personnel [] responsible for any potentially relevant Zillow technology" in this case.[21]  One of the technical engineers Zillow is hiring for employment in its Irvine, CA office, Zillow's Principal Machine Learning Engineer—Conversational AI, is a "part of the overall Artificial Intelligence team"[22] that is, in part, responsible for infringing Zillow technology in this case.  For another example, another of the technical engineers Zillow is hiring, Senior Principal Machine Learning Engineer—Search, will work in Zillow's Irvine, CA office on "develop[ing] semantic and conversational search which can process natural language queries about real estate and assist users to find the best properties for their needs."[23]   On information and belief, the "semantic and

---

[20] Ex. 15 (https://www.linkedin.com/in/gideon-williams-833b2415/); Ex. 16 (https://github.com/gideonw/ZillowHomeInfo); Ex. 17 (https://github.com/gideonw/ChatMagic).
[21] Moch Decl. ¶ 3.
[22] Ex. 18 (https://careers.zillowgroup.com/ShowJob/JobId/262121/PrincipalMachine LearningEngineer ConversationalAI).
[23] Ex. 19 (https://careers.zillowgroup.com/ShowJob/JobId/337832/SeniorPrincipal MachineLearningEngineerSearch).

conversational search which can process natural language queries about real estate and assist users to find the best properties for their needs" is relevant to Zillow's infringement of at least claim 1 of the '443 patent.

14.    Further, many Zillow employees that develop and provide additional aspects of Zillow's website and mobile applications, including "Business-to-Business" (or "B2B"), are located in this judicial district, such as: services providing advertising (including on its consumer website and mobile applications), including advertising of new construction, advertising from Zillow Group Media, and advertising from www.zillow.com/advertise; Premier Agent; and Zillow Offers.  For example, Zillow develops the technology for its "business-to-business" tools in its Irvine, CA office.[24] Zillow also employs a "Software Development Engineer" in Irvine, CA that "works on B2B features."[25]  Zillow also develops the technology "to manage the process of directly offering to sell homes that Zillow itself owns" as a part of Zillow Offers in its Irvine, CA office.[26]  Zillow employees in its Irvine, CA office also "manage Zillow's intake of 'for sale' listing and 'county direct' data feeds."[27]

15.    Zillow Group and Zillow, Inc. also develop the infringing products and services in this district during their "Hack Weeks," which are held multiple times a year and take place in, among other places, Zillow's Irvine, CA office.[28]  During the "Hack Weeks," multiple Zillow engineers work on projects to improve the Zillow website and mobile applications, including customer-facing aspects of the website and mobile applications that affect the user experience of Zillow's customers.[29]  The Hack Week projects include the development of portions of the Zillow website and mobile applications that infringe the Patents-in-Suit, as shown below.

---

[24] Moch Decl. ¶ 11.
[25] *Id.* ¶ 13.
[26] *Id.* ¶ 11.
[27] *Id.*
[28] Ex. 20 (https://www.zillow.com/tech/zillow-hack-week-summer-2019/).
[29] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Ex. 70 (screenshot of video from https://www.zillow.com/tech/zillow-hack-week-summer-2019/ at 00:34).



**Spencer Rascoff** is at Zillow Group Irvine.

Hack Week is one of my favorite events at Zillow Group, and today's event in the Irvine office was great as usual. It's always inspiring to hear innovative ideas that not only help improve our customer experience but also foster our #MoveFastThinkBig and #ZGIsATeamSport spirit. We have Hack Weeks every few months, when people are allowed to work on whatever inspires them. It's fun to see people experiment with new technologies, build new software tools to make us more efficient, and innovate for our consumers and business partners.

After the Hack Week demos today, I met with the Bridge Interactive team (Zillow Group's broker and MLS software provider) to learn about the strides they're making toward supporting our overall mission of building the largest, most trusted and vibrant home-related marketplace in the world.

Today was another day of learning, and I'm proud of all the efforts so many ZG teams make every day to make us better and smarter. #zglife

October 24, 2017 at 12:04 AM · Irvine, CA · Public

Ex. 21 (https://www.facebook.com/SpencerRascoff/posts/hack-week-is-one-of-my-favorite-events-at-zillow-group-and-todays-event-in-the-i/1955824484676939/).

16.     Moreover, on information and belief, Zillow Group and Zillow, Inc. store, or have electronic access to, numerous documents related to the design, development, operation, sale, and marketing of the accused website and mobile applications in this district.  Zillow Group and Zillow, Inc. store these documents at their offices at 600 Michelson Drive, Suite 1200, Irvine, CA 92612 in order to support their employees located there.  Further, on information and belief, Zillow Group and Zillow, Inc. have access in this district to substantially the same documents related to the design, development, operation, sale, and marketing of the accused website and mobile applications as they do in other Zillow locations in other judicial districts.  In particular, on information and belief, Zillow Group and Zillow, Inc. have servers in this judicial district through which Zillow employees working in this district can access documents, including those related to the design, development, operation, sale, and marketing of

1   the accused website and mobile applications.  Additionally, on information and belief,

2   Zillow Group and Zillow, Inc. have servers in this judicial district through which Zillow

3   employees working in this district can access source code and other computer code for

4   the accused products.  For example, Gideon Williams is a Software Engineer in Zillow's

5   Irvine, CA office, where he, on information and belief, manages and accesses at least

6   two GitHub source code repositories that relate to the consumer-facing Zillow website

7   and mobile applications, including the infringing aspects of the consumer-facing Zillow

8   website and mobile applications: ZillowHomeInfo, which is a "[s]imple web app to

9   display info about a home from the Zillow GetSearchResult API" and ChatMagic,

10  which is "[a] Zillow HackWeek project to integrate a chatbot into the Real Estate App

11  that answers questions for Beths and routes highly-qualified leads to Premier Agent

12  Concierge."[30]  Finally, on information and belief, Zillow Group and Zillow, Inc. have

13  servers in this judicial district through which Zillow employees working in this district

14  can manage and determine at least network settings for the accused products.

15  **C.    Zillow Infringes Through Its Own Actions In This District.**

16        17.    Zillow Group and Zillow, Inc. commit (directly and indirectly) acts of

17  infringement in this judicial district.  Zillow Group and Zillow, Inc. directly infringe the

18  Patents-in-Suit in this judicial district by providing Zillow's website, including at least

19  www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and mobile

20  applications, including at least iOS and Android Zillow Real Estate & Rentals, Zillow

21  Rentals, and Zillow Premier Agent applications, from their offices in this judicial

22  district to end users, businesses, and consumers also located in this judicial district.  In

23  particular, Zillow Group and Zillow, Inc. provide Zillow's website and mobile

24  applications from their offices in this judicial district by developing the website and

25  mobile applications at least in part in their Irvine, CA office and transmitting, or

26

27  ────────────────────────
    [30] Ex. 15 (https://www.linkedin.com/in/gideon-williams-833b2415/); Ex. 16

28  (https://github.com/gideonw/ZillowHomeInfo); Ex. 17 (https://github.com/gideonw/
    ChatMagic).

1  controlling the transmission of, the content of the website and mobile applications at

2  least in part from their Irvine, CA office.

3      18.    Further, Zillow Group and Zillow, Inc. directly infringe the Patents-in-Suit

4  in this judicial district by providing Zillow's website and mobile applications to end

5  users and consumers located in this judicial district.  A substantial number of users

6  access Zillow's website and mobile applications from this judicial district, and Zillow

7  infringes in this district through that access.  On information and belief, more users

8  access Zillow's website and mobile applications from this judicial district than from the

9  Western District of Washington.  Additionally, Zillow receives significant revenue from

10  the use of Zillow's website and mobile applications in this judicial district.   On

11  information and belief, Zillow receives more revenue from the use of the accused

12  products in this district than in the Western District of Washington.

13      19.    Zillow Group and Zillow, Inc. also directly infringe in this judicial district

14  because, in some circumstances, they perform the patented methods on Zillow's mobile

15  applications on user devices in this district.  As described in Counts One through Seven

16  below, Zillow Group and Zillow, Inc. perform the claimed methods using their mobile

17  applications.   Zillow provides the mobile application computer code and performs

18  method steps of the Patents-in-Suit in this judicial district.  As but one example, Zillow

19  performs the "selectively storing" step of claim 1 of the '849 patent at Zillow's servers

20  in some instances and at the user's mobile device in other circumstances.

21      20.    Zillow Group and Zillow, Inc. also directly infringe in this judicial district

22  by, on information and belief, using their website and mobile applications as end users

23  in their offices in this judicial district, in addition to also presenting the website and

24  mobile applications.  For example, Zillow Group and Zillow, Inc. test their website and

25  mobile applications in their Irvine, CA office in this judicial district, as evidenced at

26  least by the regular Hack Weeks held in the Irvine office and by Zillow's employment

27  in this judicial district of a QA Engineer.  In so testing their website and mobile

28

1   applications, Zillow Group and Zillow, Inc. infringe in a similar manner to that

2   described in Counts One through Seven below.

3       21.     Zillow Group and Zillow, Inc. also directly infringe the Patents-in-Suit in

4   this judicial district, as shown in Counts One through Seven below, because, in some

5   circumstances, they perform at least some of the methods steps of the asserted claims

6   on Edge servers located in Los Angeles or on users' computers and devices, including

7   computer and devices within this judicial district, in addition to (or in the alternative to)

8   on Zillow's servers.  For example, on information and belief, Zillow manages servers

9   in Los Angeles that host and serve content and functionality for the website and mobile

10  applications.[31]   As shown below, when www.zillow.com is requested, in some

11  circumstances, Zillow sends the requested content and functionally using the LAX3-C4

12  server, located in Los Angeles.  On information and belief, Zillow does not host content

13  and functionality for the website and mobile applications, such as hosting and

14  distributing images, storing image objects, deploying and scaling web applications and

15  services, and managing image download requests, on servers, including cloud

16  infrastructure servers, located in Seattle or the Western District of Washington.[32]

17  Additionally, on information and belief, Zillow also does not host functionality for the

18  website and mobile applications, such as Zestimate and ZHVI calculation and public

19  data ingestion, and data storage, on servers, including cloud infrastructure servers,

20

21  [31] Ex. 22 (https://aws.amazon.com/solutions/case-studies/zillow/) (explaining that
    Zillow uses Amazon CloudFront as a Content Delivery Network (CDN)); Ex. 23

22  (https://aws.amazon.com/about-aws/whats-new/2018/01/cloudfront-adds-six-new-

23  edge-locations/); Ex. 24 (https://aws.amazon.com/cloudfront/features/) (explaining

24  that Amazon CloudFront has Edge servers located in Los Angeles).
    [32] Ex. 22 (https://aws.amazon.com/solutions/case-studies/zillow/); Ex. 25

25  (https://www.zillow.com/tech/image-processing-in-aws/) (explaining that Zillow uses

26  AWS services for image storage and processing); Ex. 26
    (https://aws.amazon.com/about-aws/global-infrastructure/) (showing that AWS Global

27  Infrastructure is not located in Seattle or elsewhere within the Western District of

28  Washington).

located in Seattle or the Western District of Washington.[33]  On information and belief, Zillow also does not host functionality for the website and mobile applications, such as storage of data used to create personalized recommendations, on servers, such as cloud infrastructure servers, located in Seattle or the Western District of Washington.[34]  On information and belief, Zillow also does not host functionality for the website and mobile applications, such as its email delivery service alerting users of new listings on Zillow's consumer-facing website and mobile applications, on servers, such as cloud infrastructure servers, located in Seattle or the Western District of Washington.[35]

---

[33] Ex. 27 (https://d1.awsstatic.com/case-studies/PDF%20Case%20Studies/AWS-Casestudy_Zillow.pdf) (explaining that Zillow uses AWS services to store its data, ingest public data, and to calculate Zestimates); Ex. 26 (https://aws.amazon.com/about-aws/global-infrastructure/) (showing that AWS Global Infrastructure is not located in Seattle or elsewhere within the Western District of Washington); Ex. 67 (https://aws.amazon.com/partners/success/zillow-sparkpost/) ("It starts with [Zillow's] living database of more than 110 million U.S. homes—including homes for sale, homes for rent, and homes not currently on the market.  It also provides Zestimate home values, Rent Zestimates, and other home-related information.  To power these services, Zillow migrated from its original colocated data center to Amazon Web Services (AWS).").

[34] Ex. 68 (Screenshot of video from https://hostingjournalist.com/video/aws-reinvent-2016-zillow-classification-and-recommendation-engines-with-emr-and-spark-mac303/ at 24:00-14) (showing and explaining that all of the data that Zillow uses to make recommendations is hosted on AWS servers).

[35] Ex. 67 (https://aws.amazon.com/partners/success/zillow-sparkpost/) (describing the AWS technologies used to power Zillow's email infrastructure); Ex. 26 (https://aws.amazon.com/about-aws/global-infrastructure/) (showing that AWS Global Infrastructure is not located in Seattle or elsewhere within the Western District of Washington).



Ex. 28 (HTTP Request and Response for www.zillow.com from a browser identified as being located in Los Angeles, CA from https://toolbox.googleapps.com/apps/har_analyzer/).

| Edge Location | IATA Code | City | Country | Last Update |
|---|---|---|---|---|
| LAX1 | Los Angeles International Airport | Los Angeles, CA | United States | 2019-05-10 |
| LAX3-C1 | Los Angeles International Airport | Los Angeles, CA | United States | 2019-11-13 |
| LAX3-C2 | Los Angeles International Airport | Los Angeles, CA | United States | 2019-11-13 |
| LAX3-C3 | Los Angeles International Airport | Los Angeles, CA | United States | 2019-11-12 |
| LAX3-C4 | Los Angeles International Airport | Los Angeles, CA | United States | 2019-11-13 |

Ex. 29 (https://www.feitsui.com/en/blog/page/3) (Amazon CloudFront edge server location codes).

**D.     Zillow Directs and Controls the Performance of Infringing Method Steps In This District.**

22.     In its briefing, Zillow has indicated that "at least one step [is] performed by a third party for at least the '849, '346, '789, '389, and '904 patents."[36] To the extent Zillow does not perform one or more method steps of the Patents-in-Suit in certain circumstances, including the "selectively storing" step of claim 1 of the '849 patent, Zillow directs or controls the performance of such method steps.  As described in Counts One through Seven below, Zillow, Inc. and Zillow Group have an agency and/or contractual relationship with said third party in this judicial district and each Zillow entity controls and/or directs the performance of said third party by a number of means in this judicial district.  For example, each Zillow entity controls and/or directs the performance of said steps by servers located in Los Angeles, as discussed above, because it, for example, conditions receipt of a benefit to the servers in Los Angeles, such as payment for services, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining the actions of the servers, such as what content is delivered and how the content is delivered by and to the servers located in Los Angeles.  For another example, each Zillow entity controls and/or directs the performance of said steps by users, browsers, and mobile operating systems located in Los Angeles, because it, for example, conditions receipt of a benefit to the users, browsers, and mobile operating systems, such as reduced latency on the

---

[36] Dkt 34-1 (Ex. A to Zillow's Motion To Dismiss) at 8.

devices located in this judicial district, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining what content is delivered, and how the content is delivered to users, browsers, and mobile operating systems located in Los Angeles.

**E.     Zillow Infringes By Inducing Infringement In This District.**

23.     In addition to directly infringing the Patents-in-Suit, Zillow Group and Zillow, Inc. indirectly infringe the Patents-in-Suit in this judicial district by inducing at least users', browsers', and mobile operating systems' direct infringement, as described in Count One and Counts Three through Seven below.  As but one example, in addition to Zillow's own direct infringement of claim 8 of the '789 patent, in certain instances, users, browsers, and mobile operating systems directly infringe claim 8 of the '789 patent either by themselves or jointly, in this judicial district.  As described below, Zillow Group and Zillow, Inc. induce that infringement through acts of infringement performed in this judicial district.

24.     Despite their knowledge of the infringement of the Patents-in-Suit, Zillow Group and Zillow, Inc. have intended and continue to intend to induce patent infringement in this judicial district by users, browsers, and mobile operating systems located in this judicial district by advertising the website and mobile applications, providing customer support, and designing their website and mobile applications in such a way that the use of the website and mobile applications by a user, browser, or mobile operating system infringes the Patents-in-Suit.  For example, on information and belief, Zillow advertises its website and mobile applications to users in this judicial district, including using digital advertising.   For another example, Zillow has encouraged and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in an infringing manner by providing customer support from their Irvine office in this district, and designing their website and mobile applications to be presented in this judicial district and in such a way that the use of the website and mobile applications infringes the Patents-in-Suit.

For another example, "the technology developed in Zillow's Irvine office concerns . . . customer service,"[37] including, on information and belief, customer service to encourage and support customers and end users in their use of Zillow's website and the associated mobile applications in an infringing manner.  For another example, https://zillow.zendesk.com/hc/en-us, which is available in this judicial district, provides direction and support for Zillow's website.  On information and belief, Zillow Group and Zillow, Inc. also offer networking and support services from its offices located in the district.

**F.      Zillow Infringes By Contributing To Infringement In This District.**

25.      In addition to directly infringing the Patents-in-Suit, Zillow Group and Zillow, Inc. indirectly infringe the Patents-in-Suit in this judicial district by contributing to at least users', browsers', and mobile operating systems' direct infringement, as described in Count One and Counts Three through Seven below.  As but one example, in addition to Zillow's own direct infringement of claim 8 of the '789 patent, in certain instances, users, browsers, and mobile operating systems directly infringe claim 8 of the '789 patent either by themselves or jointly, in this judicial district.  As described below, Zillow Group and Zillow, Inc. contribute to that infringement through acts of infringement performed in this judicial district.

26.      Despite their knowledge of the infringement of the Patents-in-Suit, Zillow Group and Zillow, Inc. contribute to the infringement of the Patents-in-Suit in this judicial district by selling, offering to sell, and/or importing components, and/or a material or apparatus to this judicial district for use in practicing the patented methods of the Patents-in-Suit.  For example, Zillow Group and Zillow, Inc. provide computer code underlying the Zillow website and mobile applications, such as HTML, JavaScript, and image files, to customer and end users in this judicial district.  Users, browsers, and/or mobile operating systems infringe by using such website and/or mobile

---

[37] Moch Decl. ¶ 11.

applications, as detailed in Counts One through Seven below.  As detailed above, Zillow uses servers located in this judicial district to provide their computer code. Additionally, Zillow's computer code, and Zillow's website and mobile applications in general, is received and accessed in this judicial district.  Further, on information and belief, as a part of providing said computer code, Zillow Group and Zillow, Inc. enter into binding contracts with end users and customers in this judicial district to use Zillow's website and mobile applications, including in an infringing manner, such as by binding the users to a terms of use for the accused website and mobile applications. On information and belief, Zillow Group and Zillow, Inc. receive valuable consideration from customers and end users located in this judicial district as a part of such agreements, including information provided by customers and end users, and/or information automatically collected from customers and end users.  When customers and end users in this judicial district use the accused website and/or mobile applications, Zillow Group and Zillow, Inc. collect information about the customers and end users, their devices, and their interaction with the accused website and the associated mobile applications.  Zillow Group and Zillow, Inc. work with service providers and advertising networks to track and manage cookie information and activities of customers and end users located in this judicial district across different websites and devices.  Third parties use cookie information collected by Zillow Group and Zillow, Inc. to deliver advertisements to end users and customers located in this judicial district based on their use of the accused website and mobile applications.  Zillow Group and Zillow, Inc.'s business is funded in part through advertising.  The applications and website are especially made and/or especially adapted for use in infringing the Patents-in-Suit, at least as detailed in the individual Counts below, and are not a staple article or commodity of commerce suitable for substantial non-infringing uses because, among other things, the components sent to users are uniquely designed only to access the infringing aspects of Zillow's website and mobile applications.

## G.     IBM Has A Regular And Established Place Of Business In This District.

27.    IBM has a regular and established place of business in the Central District of California, located at 600 Anton Blvd., Costa Mesa, CA, 92626.[38]  The Costa Mesa office houses numerous employees.  While many of these employees provide business services, the IBM Costa Mesa office is also home to many engineers, working on products ranging from artificial intelligence to content management and distributed file sharing.  Positions at IBM Costa Mesa include Head of AI Strategy & Offering at IBM Content Services, Internet of Things ("IoT") Solutions Architect, and IBM Distinguished Engineer.    On August 15, 2018, IBM hosted an IBM Private Cloud/Cognitive Computer Solutions presentation from its Costa Mesa, CA office.

**Cognitive Computer Solutions** is at IBM.

IBM Private Cloud solutions. We are always on the look out for the best solutions for our clients. Thank you to Beverly Beckwith for hosting the event at the IBM offices in Costa Mesa, CA. Thank you to Vito Roderaro for showing us the opportunities that are available for our clients.
#cognitivecomputersolutions #ibmbusinesspartner



August 15, 2018 at 6:22 PM · Costa Mesa, CA · Public

Ex. 31

(https://www.facebook.com/permalink.php?id=140282896061823&story_fbid=18318 95610233868).

---

[38] Ex. 30 (https://www.yellowpages.com/costa-mesa-ca/mip/ibm-30951397).

28.    IBM stores or can access numerous documents related to the Patents-in-Suit and to this litigation in the district.  IBM has access to substantially the same documents related to the Patents-in-Suit and the instant litigation in this district as it does in other IBM offices in other judicial districts.

## INTRODUCTION

29.    IBM is a world leader in technology and innovation.  IBM spends billions of dollars each year on research and development, and those efforts have resulted in the issuance of more than 110,000 patents worldwide.  Patents enjoy the same fundamental protections as real property.  IBM, like any property owner, is entitled to insist that others respect its property and to demand payment from those who take it for their own use.  Defendants have built their business model on the use of IBM's patents.  Moreover, despite IBM's repeated attempts to reach a business resolution, Defendants refuse to negotiate a license to IBM's patent portfolio.  This lawsuit seeks to stop Defendants from continuing to use IBM's intellectual property without authorization.

## THE PARTIES

30.    Plaintiff IBM is a New York corporation, with its principal place of business at 1 New Orchard Road, Armonk, New York 10504.

31.    Defendant Zillow Group is a Washington corporation with a principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.  Zillow Group may be served with process at its registered agent C T Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

32.    Zillow Group "operates the largest portfolio of real estate and home-related brands on mobile and the web which focus on all stages of the home lifecycle: renting, buying, selling and financing."[39]  Zillow Group provides a "comprehensive suite of marketing software and technology solutions to help real estate, rental, and mortgage professionals maximize business opportunities and connect with millions of

---

[39] Ex. 4 (Zillow Group 2018 10-K) at 3.

consumers."[40]  Zillow Group generates revenue at least based on the "sale of advertising under [its] Premier Agent and Premier Broker programs."[41]  Zillow Group's portfolio of real estate and home-related brands includes Zillow.  Zillow Group owns and completely controls Zillow, Inc.

33.   Defendant Zillow, Inc. is a Washington corporation with a principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.  Zillow, Inc. may be served with process at its registered agent C T Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.  Zillow, Inc. also operates the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications, including at least the iOS and Android Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications.  Zillow, Inc. provides online real estate listings and related services to consumers and local real estate agents through Zillow's website and through the Zillow mobile applications.

34.   Zillow operates "Zillow Offers," "which allows homeowners to [] sell their home directly to Zillow . . . [and then Zillow] makes certain repairs and updates, and then lists it for sale on the open market."[42]  Zillow operates "Zillow Offers" in the Central District of California.

## **FACTUAL BACKGROUND**

**A.    IBM Is A Recognized Innovator.**

35.   IBM is recognized throughout the world as a pioneer in many aspects of science and technology.  On eight occasions, more times than any other company or organization, IBM has been awarded the U.S. National Medal of Technology, the nation's highest award for technological innovation.  During IBM's over-100-year history, IBM's employees have included six Nobel laureates, six Turing awards, five

---

[40] *Id.*
[41] *Id.*
[42] *Id.* at 10.

National Medal of Science recipients, and at least twenty-five inventors in the National Inventors Hall of Fame.

36.  These and other IBM employees have introduced the world to technology that the global community takes for granted today, including the dynamic random access memory—DRAMs—found in nearly all modern computers; magnetic disk storage—hard disk drives—found in computers and portable music players; and some of the world's most powerful supercomputers, including Deep Blue, the first computer to beat a reigning chess champion and which is on display at the Smithsonian's National Museum of American History in Washington, D.C.  IBM's commitment to developing these types of advanced computing technologies has helped to usher in the information age.

**B.    IBM Is Committed To Protecting Its Innovations Through The Patent System.**

37.  IBM's research and development operations differentiate IBM from many other companies.  IBM annually spends billions of dollars on research and development, yielding inventions that have literally changed the way the world works.  For over two decades the United States Patent and Trademark Office ("USPTO") has issued more patents to IBM than to any other company in the world.

38.  Like the research upon which the patents are based, IBM's patents also benefit society.  Indeed, the Supreme Court has recognized that the patent system encourages both the creation and the disclosure of new and useful advances in technology.  Such disclosure, in turn, permits society to innovate further.  And, as the Court has further recognized, as a reward for committing resources to innovation and for disclosing that innovation, the patent system provides patent owners with the exclusive right to prevent others from practicing the claimed invention for a limited period of time.

**C.    IBM Routinely Licenses Its Patents In Many Fields But Will Enforce Its Rights Against Those Who Use Its Intellectual Property Unlawfully.**

39.     IBM's commitment to creating a large patent portfolio underscores the value that IBM places in the exchange of innovation, and disclosure of that innovation, in return for limited exclusivity.  Indeed, IBM has used its patent portfolio to generate revenue and other significant value for the company by executing patent cross-license agreements.  The revenue generated through patent licensing enables IBM to continue to commit resources to innovation.  Cross licensing, in turn, provides IBM with the freedom to innovate and operate in a manner that respects the technology of others.

40.     Given the investment IBM makes in the development of new technologies and the management of its patent portfolio, IBM and its shareholders expect companies to act responsibly with respect to IBM's patents.  IBM facilitates this by routinely licensing its patents in many fields and by working with companies that wish to use IBM's technology in those fields in which IBM grants licenses.  When a company appropriates IBM's intellectual property but refuses to negotiate a license, IBM has no choice but to seek judicial assistance.

**D.     IBM Invented Methods For Presenting Applications And Advertisements In An Interactive Service While Developing The PRODIGY Online Service.**

41.     The inventors of the '849 patent developed the patented technologies as part of IBM's efforts to launch the PRODIGY online service ("Prodigy"), a forerunner to today's Internet, in the late 1980s.  The inventors believed that to be commercially viable, Prodigy would have to provide interactive applications to millions of users with minimal response times.  The inventors believed that the "dumb" terminal approach that had been commonly used in conventional systems, which heavily relied on host servers' processing and storage resources for performance, would not be suitable.  As a result, the inventors sought to develop more efficient methods of communication that would improve the speed and functionality of interactive applications and reduce equipment capital and operating costs.

42.     In light of the above considerations, the inventors developed novel methods for presenting applications and advertisements in an interactive service that

would take advantage of the computing power of each user's PC and thereby reduce demand on host servers, such as those used by Prodigy.  The inventors recognized that if applications were structured to be comprised of "objects" of data and program code capable of being processed by a user's PC, the Prodigy system would be more efficient than conventional systems.  By harnessing the processing and storage capabilities of the user's PC, applications could then be composed on the fly from objects stored locally on the PC, reducing reliance on Prodigy's server and network resources.

43.    The service that would eventually be called Prodigy embodied inventions from the '849 patent when it launched in late 1988, before the existence of the World Wide Web.  The efficiencies derived from the use of the patented technology permitted the implementation of one of the first graphical user interfaces for online services.  The efficiencies also allowed Prodigy to quickly grow its user base.  By 1990, Prodigy had become one of the largest online service providers with hundreds of thousands of users.  The technological innovations embodied in these patents persist to this day and are fundamental to the efficient communication of Internet content.

**E.    IBM Invented Methods For A Runtime User Account Creation Operation Using A Single-Sign-On Process In A Federated Computer Environment.**

44.    The inventors of the '346 patent developed the patented technology as part of IBM's efforts to improve single-sign-on technology.  To access a protected resource at a service provider on the Internet, a user typically has to authenticate him or herself with the service provider.  Single-sign-on technology facilitates a user's connection to resources by requiring only one authorization operation during a particular user session.  However, conventional technology at the time of the invention required that the user already have an account with the service provider to use single-sign-on technology.

45.    The inventors of the '346 patent sought to develop single-sign-on technology that would permit a new user of a service provider to access protected resources.  They developed novel methods for systems interacting within a federated computing environment to trigger a single-sign-on operation on behalf of a user that

would obtain access to a protected resource and create an account for the user.  The specification discloses how to structure a federated computing environment and the sequence and content of interactions between different systems that can support the patented methods.  The '346 patent thus extends the benefits of single-sign-on technology.

## F.   IBM Invented A Method For Computing The Desirability Of A Geographic Area By Converting Unstructured Image Data Into Structured Data.

46.   Artificial intelligence (AI) and Machine Learning are two fields of computer science which focus on inventing new technologies that provide computers with the ability to "learn" and "think" on their own, without human intervention.  More specifically, AI is concerned with creating computers that have the ability to make intelligent decisions on their own.  AI often uses machine learning to achieve this goal. Machine learning researchers create solutions that allow computers to learn from sets of data, and make predictions and decisions based on said data, in a way that mimics human "learning" or "thinking" but that is inherently wholly different from how humans "learn" and "think."

47.   IBM is a pioneer in both AI and machine learning.  As early as the 1950s, IBM computer scientists began working on "chess computing," or teaching a computer to play chess.  In order for a computer to successfully play a game of chess, it must have the ability to make decisions about which moves to make, as a person would.  IBM's efforts culminated in Deep Blue, a chess computer pictured below.  Deep Blue's computing system used various algorithms and machine learning tools to consider over 200 million possible chess positions per second, in order to select the move with the greatest probability of success.  On May 11, 1997, Deep Blue defeated the reigning world chess champion, Garry Kasparov, after a six-game match:



Ex. 32 (https://www.ibm.com/blogs/think/2017/05/deep-blue/).

48.    From Deep Blue, IBM went on to develop even more advanced AI and machine learning technologies, including Watson, IBM's suite of AI and machine learning-based services and applications.  Watson additionally uses Natural Language Processing (NLP), or the ability of a computer to read and understand sentences as a person would, to further approximate "thinking" like a human using complex processes uniquely tailored to the limitations of computers and machine languages.  To this day, IBM's Watson technology has been applied to solve numerous real-world problems, such as city infrastructure planning and personalized school curriculum design, among many others.  In 2011, an IBM Watson computer even defeated two Jeopardy! quiz show champions:



Ex. 33 (https://www.cbsnews.com/news/ibm-watson-defeats-humans-in-jeopardy/).

49.     Computer vision is a sub-field of AI and machine learning technology, which focuses on teaching computers to "think" like a human in order to "see" and derive information from visual images.  A device enabled with computer vision may have the ability to categorize the features found within a photograph.  In recent years, researchers have used various methods to attempt to create said computer vision.  One approach is to use large numbers of humans to manually provide information about images.  For example, in 2006, Google launched the Google Image Labeler.  Through the Image Labeler game, Google enlisted the help of millions of online users in order to choose the category of features found within Google's database of images.  In the game, two different users would be shown the same set of images, and each player would earn points for giving the same label or category (such as "Dogs," "Cats," "Food," "Cars," etc.) to a photograph.  Google used these user-inputted labels in order to improve its image classification software.  An example of Google Image Labeler gameplay is shown below:

Ex. 34 (Google Image Labeler, Google Operating System: Unofficial news and tips about Google, http://googlesystem.blogspot.com/2006/09/google-image-labeler.html).

50.     The inventors of the '183 patent took a different approach to developing computer vision capabilities.  Their approach started with the idea that there existed in the world a large amount of publicly-available, unutilized unstructured data in the form of image data.  Examples of this unstructured image data include video feeds from security cameras, photos taken on cell phone cameras and then uploaded to social media and the Internet, and images and videos from news stories, among others.  While these images contained valuable information about their subject matter, including indications of quality not easily captured by statistics and other traditional forms of structured data, the image data itself was not traditionally stored in a computer-readable format.  In other words, computers could not "see" the image data in order to incorporate it into computer programs and processes.

51.     For house hunters trying to locate a neighborhood or a specific home to move to, there existed a large quantity of publicly-available image data showing the conditions within these homes or neighborhoods.  As an example, programs like Google

Street View captured large amounts of said image data. These images contained information about qualities determinative of whether a neighborhood, or a particular home within a neighborhood, is desirable, such as whether a property has well-maintained landscaping, intact windows, ample lighting from street lamps, freshly painted walls, no graffiti, and much more. The inventors of the '183 patent recognized that there was a need for a system that could aggregate all of the information about home and neighborhood features found within this image data. In other words, there was a need for a computer with the ability to evaluate these images in order to gain an "intuitive" sense of a particular area without relying on human users to label the data. To solve this problem, the inventors of the '183 patent turned to AI and machine learning.

52.    With these goals in mind, the inventors of the '183 patent created a novel technique for a computer to determine a score representing the location conditions of a home or neighborhood, and to present those results to a user in the form of an easily understandable map. The inventors of the '183 patent designed a system that would collect unstructured image data of homes and/or neighborhoods, and then filter the data into a structured format in order to analyze the newly structured data for relevant elements or specific conditions shown within the images. In other words, the image data was converted from a regular photograph or video stream into individual data units, so that a computer system could analyze patterns within the individual pixels of the images, and recognize specific features within the images themselves. By breaking an unstructured image into individual units of data, the computer gained the ability to "see" features in the images, by analyzing the individual units of the image data for relevant elements.

53.    The inventors of the '183 patent appreciated that this set of stored image data could be used to form baseline measurement values for different home features by converting the large set of image data into structured data. By using this store of image data and baseline measurement values, the system of the

'183 patent eliminated the need for manual scoring of conditions within an image. Instead, as soon as new image data is received by the system and converted from unstructured to structured form, the computer can compare the features within the new images to this store of image data containing baseline values for each of the home/neighborhood features in order to evaluate the conditions in the new image data.

54.     The inventors of the '183 patent also recognized that in order to provide helpful information to users about the conditions within a home or neighborhood, the system would need to not only classify the features found within the images (such as available parking, street lamps, windows, etc.), but also make a determination of the quality of said features.  Instead of just identifying which conditions exist within an image, the computer system of the '183 patent also makes a subjective determination of the quality of each home or neighborhood condition (e.g., with a score from 1-10, with 1 indicating the "worst" condition, and 10 indicating the "best" condition).  The inventions of the '183 patent therefore provide a qualitative assessment of various conditions within a home and/or neighborhood by using already existing unstructured data.  These qualitative assessments by the computer result in condition score values for various conditions, which can be aggregated into one overall condition score value for the entire home/neighborhood.  Therefore, instead of spending hours looking through large quantities of image data, a house hunter can instead look at one simple numerical value to determine the desirability of a home and/or neighborhood.

55.     The inventors of the '183 patent also recognized that this novel technique could be used to further IBM's Smarter Cities efforts, in order to improve neighborhood public safety.  The IBM Smarter Cities initiative focuses on using technologies like AI and big data to improve the functioning of city governments, as well as the quality-of-life of citizens in general.  The '183 patent's inventors recognized that this novel technique could be used by local police departments to augment public safety efforts and improve the efficiency of the police force.  Police departments could use the inventions of the '183 patent to automatically convert streams of security camera

footage into condition scores which give a clear indication of which areas are at high risk, and may require police presence. For example, an area with a burning fire, angry individuals, and cars with broken windows would be given an overall condition score value corresponding to a high risk, and the local police would be alerted that police attention is needed in that area. By providing greater situational intelligence in a hyper-localized context, the inventions of the '183 patent could significantly reduce crime levels by increasing the efficiency of the police force. Overall, the novel technique of the '183 patent provides a simple and accurate process for determining and presenting the conditions of an area that did not exist in the prior art.

**G.   IBM Invented Methods For Filter-Based Selection And Synchronizing Of A Map Display And A List Display.**

56.   The inventions of the '789 patent provide a new way of filtering and presenting geospatial data in response to user interaction. At the time of the inventions of the '789 patent, increases in computing power and storage allowed an ever-growing amount of data to be stored in digital databases. A common type of data was geospatial data—that is, data that can be represented on a map—which presented additional specific challenges. An example of geospatial data are points of interest, which can be indicated with icons that are overlaid on a map. The computing devices of the time were able to search through millions of such points of interests and display those results in a map, as well as displaying information about those results. At the same time, advances in computing devices allowed users to interact with the results in new ways, such as allowing a user to click an area of the map occupied by an interactive icon to display a balloon containing additional information about said icon.

57.   However, the technology at the time limited how that data could be displayed and how users were able to interact with it. In particular, the mapped geospatial data was not dynamically responsive to the user's selections in the way claimed by the inventors of the '789 patent. Prior to the inventions disclosed in the '789 patent, users were presented with all, or a set number, of results that fit within the area

of the screen designated for the map, and users could not select a subset of data to be displayed in the way claimed by the '789 patent.  For example, when results were displayed on a map in response to a user's search for hotels, the user could not then select a subset of the hotels to automatically update the map to only show the selected hotels.  The prior art's approach to providing search results thus had several limitations.  While helpful for users to be able to visualize the location of search results, prior art approaches did not allow for a user to create a customized search area to fit a user's specific geographical needs.  For example, a person searching for rental properties may want to search within an irregular shaped area determined by the acceptable walking distances between several modes of public transportation.  Or they may wish to create a search that excludes particularly noisy blocks, tourist attractions, or neighborhoods that they wish to avoid.

58.   The inventors of the '789 patent encountered these obstacles in their development of IBM's Intelligent Operations Center for Smarter Cities ("IBM's IOC"), which allowed personnel in command centers to track conditions and events on an interface containing a geospatial map and an associated list display.  For example, in IBM's IOC, city personnel could monitor a wide range of city assets, from sidewalks and sewers to police cars and traffic lights.  The software drew on information collected from multiple sensors, such as traffic cameras and rain meters, to enable personnel to quickly assess the status of assets and their impact on particular city services.  During events, these personnel could use the software for real-time monitoring and to coordinate responses, such as placing traffic signs at different locations, or transporting police.  But these personnel also needed to be able to interact with the map to select specific city assets or ensure city resources were ready for emergencies.  Further, they needed to be able to track different categories of conditions and components.  For example, city personal might need to track the conditions of water lines at the same time they track the conditions of transportation resources.  A solution was needed that

1    allowed city personnel to make informed decisions by allowing them to interact with

2    different types of conditions in a uniform manner.

3        59.    Specifically, personnel in a command center using IBM's IOC needed to

4    focus on results in specifically shaped regions so as to observe of events in specific

5    neighborhoods.  To respond to these events, they needed to be able to update the results

6    after visualizing geospatial information, analyzing the information, and deselecting

7    irrelevant results.  But if a person's desired geographical search area did not neatly

8    conform to the designated square the map was displayed in, they were presented with

9    many irrelevant results, which could lead to frustration or wasted resources.

10   Particularly, if only a subset of search results were displayed on the map at a time, a

11   user would have to review every result to ensure they did not miss relevant results.

12   Using the prior methods of searching and filtering, a user would be forced to sort

13   through results that did not fit their search criteria, but were automatically returned

14   because they fit within the map's dimensions on the screen.  In contrast, the '789 patent

15   allowed a user to designate their own area of the map to search and to select all of the

16   results within that area for display to the user.

17       60.    The inventors of the '789 patent achieved this innovative method of

18   searching by allowing for greater interactivity and the ability to select a customized area

19   of the map display in order to update the selection in both the map and list.  Specifically,

20   the inventors of the '789 patent realized that a user could get more relevant search

21   results if they were able to use input/output devices to draw a selection area of a user-

22   determined shape on the map display.  The search results displayed on the map were

23   then filtered by selecting and deselecting elements according to the user-determined

24   selection area, giving users the ability to deselect the elements they were not interested

25   in.  This functionality was accomplished by the inventors of the '789 patent using an

26   approach to filtering based on deselection.  Unlike highlighting an item on a map or

27   highlighting a list item, which only emphasized wanted results, the approach of the '789

28

1   patent deemphasized unwanted results by deselecting elements outside of the user

2   drawn selection area.

3       61.    Further, by synchronizing the map display and the list display to

4   concurrently update the results, a user was presented with detailed information about

5   the points of interest in the user-designated area.  The invention was incorporated into

6   IBM's IOC and used by personnel in command centers to aid their decision-making by

7   allowing them to more finely filter their results and hone in on the most relevant

8   information.

9



Ex. 35 (From https://www.youtube.com/watch?v=x3iHUNBkTDQ at 00:56 and 00:58).

62.     Before the invention of the '789 patent, personnel using IBM's IOC would have to rely on long-range predictions for trends and directions.  Now, they can view real-time information on critical infrastructure and assets, such as medical facilities, public transportation, fire hydrants, and water treatment plants.  The inventions of the '789 patent were successfully integrated into IBM's IOC and played an integral role in the success of this product.  The novel technologies of the '789 patent greatly improved upon the prior art by allowing for multiple linked selection and filtering capabilities in the displays and bidirectional interaction between the list and map displays, regardless of the users' experience with different operating systems.  This allowed users to more finely filter their search criteria and obtain more relevant results than prior art methods.  The inventions of the '789 patent thus allow personnel to more effectively respond to events and to monitor assets and infrastructure using the claimed invention to deemphasize excess information.

**H.     IBM Invented Methods For Improving Graphical User Interfaces By Using Layers To Simultaneously Display Multiple Object Categories.**

63.    At the time of the inventions of the '389 patent, the capabilities of computing devices and networking equipment were being improved and developed at a rapid rate.  At the same time, systems that took advantage of these improvements were being implemented in all areas of industry.  These increased-capability systems were often much more complex than their predecessors due to the implementation of these new technologies.  Examples of such complex systems include the inventory of a company or store, the hardware and software components of large organizations, and the employees of large municipalities.  Although these complex systems could hold more data than past simpler systems, the large amount of data in these systems meant that it was more complicated to track and manage the operations of the system.  In order to effectively oversee these systems, users needed to be able to tell how each component functions in the system as a whole, how each component is interrelated with other components, and how to holistically understand and visualize the entire architecture of the system.  A need to better monitor these systems arose.

64.    The inventors of the '389 patent developed the patented technologies as part of IBM's efforts to improve technology for displaying information and objects in complex systems using a graphical user interface.  Due to the increasing complexity of the systems being developed, various methods were used to improve visualization of the components of such systems.  At the time of the invention, data systems had fewer components, and thus visualization of the components based on spatial positioning was sufficient.  For example, U.S. Patent No. 5,500,934 (Exhibit 36), filed in 1994, discloses displaying objects of a LAN network by positioning the objects in defined locations.  For another example, U.S. Patent No. 6,005,578 (Exhibit 37), filed in 1997, discloses grouping objects into levels.  Though such methods were adequate in those earlier years, by 2001, as systems continued to grow in complexity and the number of objects comprising such systems increased, the use of these methods became problematic.  The volume of information and components of these new systems made it difficult to organize and present information on a computer's two dimensional screen using

1   existing methods in a way that was both comprehensive and understandable.   In
2   particular, using such methods to display all of the information or components at once
3   resulted in an overly cluttered display with various objects overlapping each other.  This
4   made it difficult, if not impossible, to determine the relevant details of and relationships
5   between the information that a user was attempting to view.

6       65.     Additionally, complex systems also started to be comprised of more
7   categories of objects.  As an example, an organization can be comprised of several
8   computing devices, such as personal computers and servers, various peripheral devices,
9   such as printers and routers, and various types of software, such as application software
10  and middleware software.  A user managing such a system needed to be able to identify
11  and view these various categories of objects to understand how the various parts of the
12  system interact together to diagnose any issues or deficiencies that may be present.
13  However, the cluttering and overlapping of objects in existing methods for displaying
14  such information made it impossible to decipher the relationships between the various
15  pieces of information and components.  Moreover, the computer systems were unable
16  to independently determine the categories and apply the differences.  Thus, there was a
17  need in the prior art to be able to display, on a two dimensional computer screen, a large
18  amount of information in a manner that allowed a user to seamlessly distinguish and
19  navigate between various groups of related information so that users can effectively
20  monitor and manage their system.

21      66.     The IBM Tivoli team recognized the difficulties businesses dealt with in
22  trying to monitor and manage their business systems due to the increasing level of
23  complexity and the increasing number of resources comprising the systems.  The Tivoli
24  team thus sought to develop the Tivoli Global Enterprise Manager ("GEM") in order to
25  provide their business clients with an all-inclusive solution for managing all aspects of
26  their clients' business environment.  The most pertinent problem identified by the Tivoli
27  team was the users' inability to understand their business system as a whole.  Because
28  of the vast number of resources and interdependencies between such resources,

businesses needed a solution to be able to distinguish between each of these various resources and to be able to easily comprehend how these resources interact.  The inventions of the '389 patent resolve these problems by disclosing a method that allows for effective monitoring of the objects of the system even where the display of the objects are clustered and overlapping one another by grouping objects of a category into layers, applying non-spatially distinguishable display attributes to the objects of these layers, and applying a display emphasis on prioritized layers.  Though the solution was ultimately not included in the commercialized version of the GEM due to the timing of the development of this feature, the inventors foresaw that the need for the inventions of the '389 patent existed at the time of the invention and would continue to exist from that point forward due to the inevitably increasing complexities of all systems.

67.    The application of the non-spatially distinguishable display attributes to different layers of objects was one of the features developed in response to the ineffectiveness of prior art methods at the time of the invention.  The prior art methods grouped objects without using non-spatially distinguishable display attributes.  Such grouping and organizing is sufficient in a lower complexity system, but by the time the technology of the '389 patent was invented, many systems were comprised of thousands of objects.  The inventors of the '389 patent, noting that using prior art methods on these complex systems would lead to an incomprehensible display of overlapping and cluttered objects, developed an innovative method that accounts for the cluttered display by using non-spatially distinguishable display attributes.  The use of such attributes allows a user to still see the groupings of objects that the user desires even when they are cluttered with other objects by visually distinguishing these objects.  Thus, for example, if a red hue is applied to the objects of the layer, a user would be able to see the layer even where there are thousands of other objects on display by noting which objects are red.  Additionally, the patent discloses a method allowing a user to rearrange the various layers to allow the user to effectively monitor their system with different points of view.  For example, in a hotel inventory management system, the user may

1   want to view layers of hotels based on their star rating.  If the user then elects to view

2   layers of hotels based on their location, the patent discloses a method wherein the hotels

3   are re-matched to a different layer based on location, and a different non-spatially

4   distinguishable display attribute is then applied to the hotels of each of these new layers.

5       68.    The methods in existence at the time of the invention also did not include

6   the implementation of applying a display emphasis to visually distinguish between

7   layers in the way claimed by the inventors.  Because systems had fewer objects when

8   the prior art methods were developed, there was no need to distinguish between layers.

9   It was sufficient to group together the objects and allow a user to navigate between these

10  groups.  However, as the number of objects in a system increased, merely navigating

11  between spatially-separated groups of objects was insufficient for focusing on one

12  group over another because of insufficient space on a screen to allow for a feasible

13  display of these groups.  Therefore, not only did the inventors introduce the use of non-

14  spatially distinguishable display attributes to represent various layers, the inventors also

15  disclosed the implementation of a display emphasis between layers so that users could

16  readily focus on a specific layer.  The application of a display emphasis allows one layer

17  to be emphasized over the other layers, such as by overlapping the focused layer over

18  the others or by saturating the color of that focused layer, so that the user can easily

19  view the layer that is prioritized.  Additionally, the invention discloses reapplying the

20  display emphasis when the layers are reordered.  This allows the user to navigate

21  between layers by emphasizing the newly prioritized layer over the other layers.  The

22  addition of a display emphasis thus enables users to view the layers in a particular order.

23      69.    The inventions of the '389 patent are not the only possible solution to the

24  need for effective display of a large number of objects.  Other solutions existed as well,

25  but lack some of the advantages of the invention.  For example, the display technology

26  used by Yelp allows the user to select a single category of objects at a time and displays

27  only the objects of that category on their map.

28





Ex. 38 (https://www.yelp.com/search?

find_desc=Restaurants&find_loc=White%20Plains%2C%20NY).



Ex. 39 (https://www.yelp.com/search?

find_desc=Bars&find_loc=Pleasantville%2C%20NY).

70.     Though this method ultimately allows a user to view the objects within the inventory of Yelp by viewing each category separately, it fails to include the use of displaying layers wherein the objects of each layer are displayed using non-spatially distinguishable display attributes.  The use of layers allows a user to see the various objects of the system at one time to provide the user with a better understanding of the various objects present in the system.  In the case of Yelp, using the inventions of the '389 patent would provide a user a better understanding of the composition of establishments in the town and the total number of options that a user can consider to plan out the user's itinerary.

71.     Another alternative solution was invented by Robert Uthe, one of the co-inventors of the '389 patent, and disclosed in U.S. Patent No. 10,250,454 (Exhibit 40, the "'454 patent").  The '454 patent teaches grouping all the objects with a selected

attribute into a single subgroup represented by a display element shown on the computer screen.  The user can select this display element to view information common to all the objects of that subgroup.  Although the '454 patent does teach a particular solution for displaying the numerous components of a system, the '389 patent's invention includes advantages that the '454 patent's invention is missing.  In particular, the use of layers allows a user to visually understand the number of components each layer is comprised of and also allows a user to select a specific object of a layer as opposed to having to select the entire set of objects.

## I.   IBM Invented Methods For Automatically Associating Related Advertisements To Individual Search Results Items.

72.   The inventors of the '443 patent developed the patented technologies as part of IBM's efforts to improve Internet search engine technology in the area of e-commerce solutions and, in particular, targeted advertisements.  Prior to the inventions of the '443 patent, with the accelerated growth of the Internet and its associated e-commerce activities, advertising over the Internet became increasingly more acceptable to Internet users, and marketing professionals looked for ways to optimize online advertising.  But the technology used to deliver targeted advertisements to Internet users based on user profiles presented unique challenges, different from those faced by offline advertising (such as person-to-person marketing) because computers could not determine from context alone what advertisement should be shown in users.

73.   One possible solution was targeted banner advertising.  At the time of the inventions of the '443 patent, it was typical to provide banner advertisements, or banner ads, to website users.  Banner ads are a form of online advertising that embed advertisements into a website, typically appearing on a site as a bar, column, or box. An early banner ad is seen in the image below:

Ex. 41 (https://www.theatlantic.com/technology/archive/2017/04/the-first-ever-banner-ad-on-the-web/523728/).

74.     At the time of the inventions of the '443 patent, online advertising focused on targeting specific banner ads to a specific audience that would hopefully include those Internet users who were most likely to be interested in, and make use of, the advertised product.  In particular, advertisers displayed pre-selected advertisements for a general audience or for a target audience based on user profiling.  Profiling involved assimilating information from user profiles collected from each Internet user on the basis of the user's areas of interest and parameters of the user known to the system.  Websites could relate the user to one or more stereotypes, operate stereotypic rules, and deliver a targeted advertisement to a user on the basis of those rules.  Advertisers would collect the information required to build a user profile by sending a small piece of data (called a cookie) from a website and storing it on the user's computer while the user is browsing, and later retrieving that cookie on a subsequent visit to the site by the user.  For example, a user would visit the website www.sears.com looking for an appliance (such as a dishwasher).  The website would send a cookie to the user's computer indicating that the user was interested in dishwashers.  If a user later returned to www.sears.com, the website would see the cookie indicating the user's interest in dishwashers, and present targeted advertisements to the user for various dishwashers offered for sale by Sears.

75.     These targeted banner ads from user profiles were an effective form of advertising on websites with high view rates, but they also had inherent drawbacks. First, they were shown to users regardless of whether those ads had been specifically solicited.  Second, those ads relied on user profiling that required collecting data about the user and building user profiles.  Third, the user profiles were based on past user data and thus were immediately outdated.

76.     In particular, Internet-based advertising was not optimized to target only those users who were most likely be interested in, and make use of, the advertised product.  For example, it was important, yet extremely difficult, to ensure that user profiles remain current.  A user who was interested in, for example, buying an automobile may no longer be interested in it, simply because he or she had just purchased one.  Additionally, past methods of user profiling targeted advertising schemes, which relied on tracking a user's web activity, wholly failed to account for offline purchases, or untracked online purchases, and would continue to deliver advertisements to users for products they had already bought.  This was unacceptable to advertisers, who often paid based on the number of potential customers who viewed an advertisement.  It was also unacceptable to Internet users, who had no viable means to express that they were no longer interested in the advertised goods, or to express that they were receptive to such advertisements.

77.     In addition, it was also difficult to identify a specific user, such as a user who recently became interested in purchasing automobiles, and associate the correct advertisement profile to the user.  Prior art targeted advertising schemes based on user profiling could not solve this problem because the user profiles were built by analyzing users' past web activity, which was not necessarily reflective of their present interests.  This problem was compounded by users for which profiles did not exist or by those who were browsing anonymously.  In short, advertising using user profiles could not intelligently predict what advertisement should be shown in users.

78.     The inventors of the '443 patent recognized these limitations of the existing solutions and developed their novel technologies for associating an advertisement with a search result.  The '443 patent's inventors developed a method that no longer relied on the use of user profiling, which was difficult and cumbersome to employ.  The inventors realized that they could present relevant advertisements to users on demand by assimilating, correlating, and displaying advertisements during an Internet search, analyzing the search result to produce at least one keyword, and finally

1    identifying associated advertisements from a repository having a word that matches the

2    keyword as related to the search result.   Advertisements could therefore be more

3    accurately targeted to users' current interests without having to rely on potentially

4    outdated information contained in a user profile.   Furthermore, by focusing on the

5    search performed by the user, the inventors of the '443 patent were able to present

6    relevant advertisements even if a profile did not exist for that particular user or the user

7    was browsing anonymously.   The inventors realized that this would provide a more

8    accurate distribution of advertisements to users and likely increase the chance that users

9    would click on the presented advertisements.

10       79.    More specifically, the inventors of the '443 patent devised methods for

11   associating an advertisement with a result from an information repository search by a

12   user.  An information repository is a product database for potentially matching product

13   advertisements to the search results.  The association step involves analyzing the search

14   result to produce a keyword, using that keyword to search for an associated

15   advertisement within the repository, identifying the associated advertisement from the

16   repository having a word that matches the keyword as related to the search result, and

17   correlating the associated advertisement with the search result.

18       80.    Using the methods of the '443 patent, users would enter a search and

19   receive search results.  Those results were analyzed to produce a keyword relating to

20   the search result, thereby eliminating the need for developing a complex user profile.

21   That keyword could then be used to search within the information repository for

22   potentially matching product advertisements (as opposed to prior art methods that

23   displayed banner advertisements to users irrespective of whether they matched a

24   keyword).  When an advertisement matching the keyword was identified, it could be

25   shown to the user.  In this way, the inventors ensured that the advertisements were

26   relevant to a user's present interest, instead of past interests (as was done with user

27   profiling).  Other novel methods of the '443 patent included providing the correlated

28   advertisement to a user on-demand, thereby solving the problem of delivering ads to

users who were not interested in seeing them.  Moreover, the associated advertisement could be displayed as a user-selectable icon containing a link to the associated advertisement, thereby giving the user a choice of whether or not to view the advertisement, further ensuring that advertisements were only delivered to those Internet users who would most likely be interested in, and make use of, the advertised product.

## J.   IBM Invented Methods For Improving Computer-Generated Promotions By Using Promotion Templates.

81.   The inventors of the '904 patent developed the patented technologies as part of IBM's efforts to improve how promotions were generated and how they were subsequently managed and organized.  At the time of the inventions of the '904 patent, increases in computer power and network speeds increased the number and complexity of online advertising.  Marketers became particularly interested in individualized advertising, including both individualized advertisements and well as whole advertising campaigns, because of the increased effectiveness of such individualized advertising. However, there were significant obstacles to providing individualized advertisements and advertising campaigns online.

82.   Initially, marketers would create singular promotions and query a customer database in order to find a customer or group of customers to whom it applied.  This created challenges for generating and keeping track of the various promotions that were created.  In order to be effective, individual promotions needed to be quickly and efficiently created and delivered to the relevant customers.  The number of individual promotions that needed to be generated could range from hundreds to thousands of individual promotions.  Problems arose in trying to individually create each promotion for display to the relevant customers in a timely fashion.  Individually creating each promotion could be extremely time consuming and resource intensive.  It was possible that by the time each promotion had been created and made ready for display, the

1  information contained in the promotion had become outdated.  Thus, there existed a
2  need to quickly and effectively create each individual promotion.

3      83.    Moreover, beyond the problem of how to quickly create the individual
4  promotions, there still existed the problem of finding the appropriate promotions,
5  organizing them, and getting those promotions to the right customers.  Previous systems
6  generally allowed the marketers to choose the customers a promotion was sent to, which
7  risked a customer list that was over or under-inclusive of the relevant customer base.  A
8  need existed to find and group related promotions together in a way so that they could
9  then be provided to the relevant customers.  Compounding these problem, promotions
10 were needed in a multitude of various situations, all of which with different
11 requirements and needs.  For example, marketers in different industries may have
12 specialized considerations as to promotion frequency, speed, and variation, and each
13 industry likely has different types of promotions directed to different types of products
14 or services.  Thus, what was required was not a singular fix, but a method that allowed
15 different needs to be addressed using different implementations.

16     84.    The inventors of the '904 patent addressed these needs using promotion
17 templates that could dynamically create individual promotions and individual
18 promotion lists.  Using the promotion templates, the inventors were able to create
19 collections of promotion instances (which are the individual promotions) and promotion
20 versions (which are specific implementations of those individual promotions).  These
21 collections, called promotion lists, can be distributed to customers and used, for
22 example, as individualized promotion campaigns.  To achieve this, the inventors
23 designed the promotion templates so that each one was an editable object that can
24 repeatedly produce multiple other promotion templates, promotion instances, or
25 promotion versions based upon specific parameters determined by the user.  Therefore,
26 users can more easily store, manipulate, and distribute the promotions by creating a
27 promotion list populated by relevant promotions, generated through the use of various
28 promotion templates

85.    Promotion templates are able to create replicable promotions because they may include both preassigned attributes, which will define the resulting promotion and are likely to be used across all templates, and custom attributes, which may be unique to a specific template or group of templates and are thus parameterized fields for which users can change the values.  For example, if a user wants to generate promotions for specific flights, the attribute fields "FavoriteTrips.From" and "FavoriteTrips.To" could be populated with the values "Boston" and "New York," respectively, for a customer interested in traveling between those two cities.  In this way a user can now generate countless promotion instances or versions which advertise the price of trips from Boston to New York for different dates and different price-points all produced by the same template.  If another customer's favorite cities to travel between were Atlanta to San Diego, this same template could generate promotions to advertise flights on this route to that specific customer.  Thus, a single flights-specific template can be repeatedly used in different scenarios.  This made it possible to create a massive promotion database, which could be easily queried, for the first time.

86.    Further, the innovative method of the '904 patent allowed those promotions to be further individualized in specific promotion lists responsive to the user's search query.  Following from the previous example, a customer who is traveling from Boston to New York might be shown a promotion list that includes promotions for hotels in New York, promotions for activities in New York, as well as promotions for flights from Boston to New York, all created from different promotion templates.

87.    As illustrated below, promotions in the prior art were distributed by first being generated by a user, after which the promotion was sent to a customer or customers deemed to be part of the relevant customer base for each respective promotion.  In this one-way process of distributing promotions, information was only received from the consumers after the promotions were already sent.



88.    In contrast, the inventors of the '904 patent developed a way to group the relevant promotions by using user-generated search queries to identify one or more attributes of a promotion that match the attributes of the search queries.  As illustrated below, the methods of the '904 patent use promotion templates to create promotion instances or versions which are stored in a repository.  The system first identifies certain attributes associated with the search query, and then retrieves promotions with matching attributes.  The retrieved promotions can then be added to a promotion list, which is returned to the relevant customers.  This method allows an individualized promotion list filled with individualized promotions.  The inventors were thus able to generate a dynamic promotion list that could be updated, without user intervention, to reflect any changes in promotion instances by using a query that dynamically returns promotion instances that match the query.  This reversed the previously utilized, one-way process, and, coupled with the ability of promotion templates to generate a large repository of promotions, allowed for this massive improvement in promotion distribution.

## K.    Zillow Has Built Its Business By Infringing IBM's Patents.

89.    Zillow provides customers with access to real estate listings and provides real estate agents with advertisements and other services.  Zillow also purchases homes directly from customers that they repair and sell.[43]  Zillow Group and its subsidiaries have grown rapidly over the last several years and now have over one billion dollars of annual revenue.[44]

90.    Rather than build their business on their own technologies, Zillow has appropriated the inventions of the Patents-in-Suit.  The website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the associated mobile applications, including at least the iOS and Android Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications, under Zillow's control use the technology claimed by the Patents-in-Suit to provide customers

---

[43] Ex. 7 (https://www.zillow.com/offers/) (describing the process by which Zillow purchases and then sells homes).
[44] Ex. 4 (Zillow Group 2018 10-K) at 42.

1  with access to real estate listings; provide Zillow's Business-to-Business services,
2  provide advertisements and other services for real estate agents, including through
3  Promoted Communities for new constructions, Zillow's Premier Agent service, and
4  other properties involving Zillow Group Media; and buy, service, advertise, and provide
5  properties through Zillow Offers.  IBM has informed Zillow of its infringement, but
6  Zillow continues to infringe despite the knowledge of their infringement.

7      91.   IBM has attempted to reach a patent licensing agreement to end Zillow's
8  unauthorized use of IBM's patents since at least June 2016.  Since that time, IBM has
9  sent Zillow numerous letters concerning their infringement of the Patents-in-Suit.  IBM
10  has also met and held telephone calls with representatives from Zillow to attempt to
11  negotiate a license.

12     92.   On August 11, 2017, IBM sent Zillow a letter informing them that they
13  were infringing several patents, including the '849 and '789 patents.  On October 31,
14  2017, IBM further informed Zillow that it was infringing the '346 patent.  At a meeting
15  between the parties on November 13, 2017, IBM presented detailed claim charts
16  demonstrating how Zillow was infringing the '849, '789, and '346 patents, along with
17  several others patents.

18     93.   IBM informed Zillow that it was infringing the '183 and '389 patents on
19  January 14, 2019.  At that time, IBM also provided detailed claim charts demonstrating
20  how Zillow was infringing those patents.  Then, on August 26, 2019, IBM informed
21  Zillow that it was infringing the '904 and '443 patents and again provided detailed claim
22  charts demonstrating their infringement.  Finally, on November 25, 2019, IBM provided
23  additional evidence of Zillow's infringement of the '183 patent, including an additional
24  detailed claim chart demonstrating this infringement.

25     94.   IBM has repeatedly attempted to reach a negotiated solution to Zillow's
26  infringement of the Patents-in-Suit and has presented detailed examples of their
27  infringement of each of the Patents-in-Suit.  But Zillow has refused to engage in any
28  meaningful discussions about reaching a license agreement to end their infringement of

1  IBM's patents.  Instead, Zillow has continued to willfully infringe IBM's patents so as

2  to obtain the significant benefits of IBM's innovations without paying any

3  compensation to IBM.

4      95.   Because IBM's over three-year struggle to negotiate a license agreement

5  that remedies Zillow's unlawful conduct has failed, IBM has been forced to seek relief

6  through litigation.  Among other relief sought, IBM seeks royalties on the billions of

7  dollars in revenue that Zillow has received based on their infringement of IBM's

8  patented technology.

9                          **COUNT ONE**

10               **INFRINGEMENT OF THE '849 PATENT**

11     96.   IBM incorporates by reference paragraphs 1-95.

12     97.   IBM is the owner of all right, title and interest in the '849 patent.  The '849

13  patent was duly and properly issued by the USPTO on July 4, 2006.  The '849 patent

14  was duly assigned to IBM.  A copy of the '849 patent is attached hereto as Exhibit 42.

15     98.   The '849 patent is valid and enforceable.

16     99.   In violation of 35 U.S.C. § 271, Zillow has infringed, contributed to the

17  infringement of, and/or induced others to infringe one or more of the claims of the '849

18  patent by having made, designed, offered for sale, sold, provided, used, maintained,

19  and/or  supported  their  website,  including  at  least  www.zillow.com,

20  www.zillowgroupmedia.com,  and  subdomains  thereof,  and  the  associated  mobile

21  applications,  including  the  Zillow  applications  for  mobile  devices  running  on,  for

22  example,  the  Apple  iOS  and  Google  Android  operating  systems,  including  at  least

23  Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications.

24  Zillow's infringement is continuing.

25     100.  Zillow Group "operates the largest portfolio of real estate and home-

26  related brands on mobile and the web which focus on all stages of the home lifecycle:

27  renting, buying, selling and financing. . . .  The Zillow Group portfolio of consumer

28

brands includes Zillow . . . ."[45]   Zillow Group's "technology solutions" and actions related to such technology infringe, direct or control infringement, induce infringement, and/or contribute to the infringement through Zillow's website and through the mobile application instrumentalities.

101.   Zillow, Inc. owns and operates the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications on, for example, the iOS and Android operating systems. Zillow, Inc. provides online real estate listings and related services to consumers and local real estate agents through the website and mobile application instrumentalities.

102.   Zillow Group and Zillow, Inc. directly infringe one or more claims of the '849 patent through the Zillow website and the Zillow mobile applications, as described below.  Additionally, Zillow Group directs and controls the infringing behavior of its agent, Zillow, Inc., which Zillow Group operates and wholly owns.

103.   For example, as shown in Exhibit 43, the Zillow website and Zillow mobile applications infringe at least claim 1 of the '849 patent at least by:

a.   presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request applications, from the network, that include interactive services, the respective reception systems including a monitor at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

b.   structuring applications so that they may be presented, through the network, at a first portion of one or more screens of display; and:

c.   structuring advertising in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion of one or more screens of display concurrently with applications, wherein structuring the

---

[45] Ex. 4 (Zillow Group 2018 10-K) at 3.

1  advertising includes configuring the advertising as objects that include advertising data

2  and;

3      d.      selectively storing advertising objects at a store established at the

4  reception system.

5      104.    For another example, Zillow Group and Zillow, Inc. infringe at least claim

6  1 of the '849 patent through Zillow's website and mobile applications in a similar

7  manner to that shown in Exhibit 43, at least when the advertising is from, or involves,

8  Zillow Group Media; when the advertising is for properties Zillow owns through Zillow

9  Offers; and when the advertising is for other advertised properties, such as Promoted

10 Communities for new constructions, properties managed by or associated with Premier

11 Agent, and other properties promoted using Zillow's advertising services.

12



Ex. 44 (Zillow search in Riverside County, CA).

Ex. 45 (https://www.zillow.com/resources/new-construction/training/inline-community-preview/).



Ex. 46 (https://www.zillow.com/marketing/rental-property-advertising/).

105.   For another example, Zillow Group and Zillow, Inc. infringe at least claim 1 of the '849 patent through the Zillow Group Media service in at least a similar manner to that shown in Ex. 43:

# Ad Products

Reach coveted audiences by featuring your brand in native placements across Zillow Group brands and devices. Integrate your message into the user experience with ad products that are perfectly formatted for every device to achieve outstanding performance results.

Ex. 47 (https://www.zillowgroupmedia.com/native-ads/).

106.   Zillow Group and Zillow, Inc. infringe at least claim 1 of the '849 patent through the Zillow mobile applications, including at least the iOS and Android Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications, in a similar manner as through the website.

107.   Alternatively, to the extent that any step of claim 1 of the '849 patent, including the "structuring" or "selectively storing" steps, are performed by a third party (in addition to and/or separate from Zillow's performance), such as a user, browser, or mobile operating system, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party.   For example, each Zillow entity controls and/or directs the performance of the "selectively storing" step by users, browsers, and mobile operating systems because it, for example, conditions receipt of a benefit, such as reduced latency, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining what image and other data is cached and for how long.   For another example, each Zillow entity controls and/or directs the performance of the "selectively storing" step by users, browsers, and mobile operating systems because it profits from the performance by, for example, increasing use and user interactions from reduced latency, and each Zillow entity has the right to stop or limit infringement, by, for example, determining that image and other data is not cached.

108.   Alternatively, to the extent that any step of claim 1 of the '849 patent, including the "structuring" or "selectively storing" steps, are performed by a third party (in addition to and/or separate from Zillow's performance), such as a Content Delivery Network ("CDN") or other server, including Amazon CloudFront, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party.  For example, each Zillow entity controls and/or directs the performance of the "selectively storing" step by CDNs because it, for example, conditions receipt of a benefit, such as payment for services, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining what image and other data is cached and for how long.   For another example, each Zillow entity controls and/or directs the performance of the "selectively storing" step by CDNs because it profits from the performance by, for example, increasing use and user interactions from reduced latency, and each Zillow entity has the right to stop or limit infringement, by, for example, determining that image and other data is not cached.

109.   Zillow Group and Zillow, Inc. have had knowledge of the '849 patent and their alleged direct and indirect infringement since August 11, 2017.

110.   Zillow Group and Zillow, Inc. also indirectly infringe one or more claims of the '849 patent through the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com,  and  subdomains  thereof,  and  the  Zillow  mobile applications.  On information and belief, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) directly infringe the '849 patent through the use of the website and mobile applications to view at least real estate listings.  Zillow Group's Annual Report lists $1,333,554,000 of revenue from its website and mobile applications which "generate revenue from the sale of advertising services and our suite

of marketing software and technology solutions."[46]   The revenue indicates that numerous end users and customers used Zillow's website and the associated mobile applications in order to view real estate listings and thereby infringe the '849 patent.  In particular, to the extent Zillow does not perform the method steps, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) perform at least the method of presenting advertising recited by claim 1 of the '849 patent as shown in Exhibit 43.

111.   On information and belief, despite knowledge of the infringement of the '849 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to contribute to patent infringement by third parties by selling, offering to sell, and/or supplying components, and/or a material or apparatus for use in practicing the patented methods of the '849 patent by at least end users and consumers, as described in this section.

112.   For example Zillow Group and Zillow Inc. provide computer code underlying the Zillow website and mobile applications, such as HTML, JavaScript, and image files, to customers and end users for use in infringing the '849 patent and such computer code does not have substantial non-infringing uses.  Such computer code is especially made and/or especially adapted for use in infringing the '849 patent and is not a staple article or commodity of commerce suitable for substantial non-infringing use.  The only substantial use of Zillow's computer code responses is for the claimed subject matter involving presenting applications and advertisements in an interactive service as described in the '849 patent.

113.   Further, on information and belief, as a part of providing said computer code, Zillow Group and Zillow, Inc. enter into binding contracts with end users and customers to use Zillow's website and mobile applications, including in an infringing

---

[46] Ex. 4 (Zillow Group 2018 10-K) at 3, 42.

manner including by binding the users to a terms of use for the accused website and mobile applications.  On information and belief, Zillow Group and Zillow, Inc. receive valuable consideration from customers and end users located in this judicial district, including information provided by customers and end users, and/or information automatically collected from customers and end users.  When customers and end users in this judicial district use the accused website and/or mobile applications, Zillow Group and Zillow, Inc. collect information about the customers and end users, their devices, and their interaction with the accused website and the associated mobile applications. Zillow Group and Zillow, Inc. work with service providers and advertising networks to track and manage cookie information and activities of customers and end users across different websites and devices.  Third parties use cookie information collected by Zillow Group and Zillow, Inc. to deliver advertisements to end users and customers based on their use of the accused website and mobile applications.  Zillow Group and Zillow, Inc.'s business is primarily funded through advertising.  The application and website are especially made and/or especially adapted for use in infringing the Patents-in-Suit, at least as detailed in the individual Counts above, and are not a staple article or commodity of commerce suitable for substantial non-infringing uses because, among other things, the components sent to users are uniquely designed only to access the infringing aspects of Zillow's website and mobile applications.

114.   On information and belief, despite their knowledge of the infringement of the '849 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to induce patent infringement by third parties, including at least the direct infringement by end users and customer, as described in this section.  Zillow has encouraged and instructed and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in a manner that infringes the '849 patent by advertising the website and mobile applications, providing customer support, and designing their website and mobile applications in such a way that the use

of the website and mobile applications by an end user or customer infringes the '849 patent.

115.  For example, Zillow has encouraged and instructed and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in an infringing manner by providing customer support from their Irvine office in this district, and designing their website and mobile applications in such a way that the use of the website and mobile applications by an end user or customer infringes the Patents-in-Suit.  For example, "the technology developed in Zillow's Irvine office concerns . . . customer service," including, on information and belief, customer service to encourage and support customers and end users in their use of Zillow's website and the associated mobile applications in an infringing manner.[47] For another example, https://zillow.zendesk.com/hc/en-us provides direction and support for Zillow's website.  On information and belief, to the extent Zillow was not aware that they were encouraging their customers and end users to infringe the '849 patent, its lack of knowledge was based on being willfully blind to the possibility that their acts would cause infringement.

116.  IBM has been damaged by the infringement of its '849 patent by Zillow and will continue to be damaged by such infringement.  IBM is entitled to recover from Zillow the damages sustained by IBM as a result of Zillow's wrongful acts.

117.  The infringement by Zillow of the '849 patent was, and continues to be, deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  In committing these acts of infringement, Zillow actually knew or should have known that their actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

---

[47] Moch Decl. ¶ 11.

118.   IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Zillow is enjoined therefrom by this Court.  In committing these acts of infringement, Zillow actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

## COUNT TWO

## INFRINGEMENT OF THE '346 PATENT

119.   IBM incorporates by reference paragraphs 1-118.

120.   IBM is the owner of all right, title and interest in the '346 patent.  The '346 patent was duly and properly issued by the USPTO on December 8, 2009.  The '346 patent was duly assigned to IBM.  A copy of the '346 patent is attached hereto as Exhibit 48.

121.   The '346 patent is valid and enforceable.

122.   In violation of 35 U.S.C. § 271, Zillow has infringed one or more of the claims of the '346 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported their website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the associated mobile applications, including the Zillow applications for mobile devices running on, for example, the Apple iOS and Google Android operating systems, including at least Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications. Zillow's infringement is continuing.

123.   Zillow Group "operates the largest portfolio of real estate and home-related brands on mobile and the web which focus on all stages of the home lifecycle: renting, buying, selling and financing. . . .  The Zillow Group portfolio of consumer brands includes Zillow . . . ."[48]   Zillow Group's "technology solutions" and actions

---

[48] Ex. 4 (Zillow Group 2018 10-K) at 3.

1 related to such technology infringe and/or direct or control infringement through
2 Zillow's website and through the mobile application instrumentalities.

3    124.   Zillow, Inc. owns and operates the Zillow website, including at least
4 www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the
5 Zillow mobile applications on, for example, the iOS and Android operating systems.
6 Zillow, Inc. provides online real estate listings and related services to consumers and
7 local real estate agents through the website and mobile application instrumentalities.

8    125.   Zillow Group and Zillow, Inc. directly infringe one or more claims of the
9 '346 patent through the Zillow website and the Zillow mobile applications, as described
10 below.  Additionally, Zillow Group directs and controls the infringing behavior of its
11 agent, Zillow, Inc., which Zillow Group operates and wholly owns.

12    126.   For example, as shown in Exhibit 49, the Zillow website and Zillow mobile
13 applications infringe at least claim 1 of the '346 patent at least by:

14       a.   managing user authentication within a distributed data processing
15 system, wherein a first system and a second system interact within a federated
16 computing environment and support single-sign-on operations in order to provide
17 access to protected resources, at least one of the first system and the second system
18 comprising a processor, the method comprising:

19       b.   triggering a single-sign-on operation on behalf of the user in order
20 to obtain access to a protected resource that is hosted by the second system, wherein the
21 second system requires a user account for the user to complete the single-sign-on
22 operation prior to providing access to the protected resource;

23       c.   receiving from the first system at the second system an identifier
24 associated with the user; and

25       d.   creating a user account for the user at the second system based at
26 least in part on the received identifier associated with the user after triggering the single-
27 sign-on operation but before generating at the second system a response for accessing
28 the protected resource, wherein the created user account supports single-sign-on

operations between the first system and the second system on behalf of the user.

127.   The Zillow mobile applications, including at least the Zillow Real Estate & Rentals and the Zillow Rentals applications, infringe at least claim 1 of the '346 patent in a similar manner as through the website.

128.   Alternatively, to the extent that any step of claim 1 of the '346 patent, including the "triggering" step, is performed by a third party (in addition to and/or separate from Zillow's performance), such as a user, browser, or mobile operating system, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party. For example, each Zillow entity controls and/or directs the performance of the "triggering" step by users, browsers, and mobile operating systems because it, for example, conditions receipt of a benefit, such as access to certain applications on Zillow's website and mobile applications, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, triggering the single-sign-on operation using its underlying computer code.   For another example, each Zillow entity controls and/or directs the performance of the "triggering" step by users, browsers, and mobile operating systems because it profits from the performance by, for example, increasing the number of signed-in users accessing Zillow's website and mobile applications, and each Zillow entity has the right to stop or limit infringement, by, for example, not enabling the use of single-sign-on operations or account creation.

129.   Zillow Group and Zillow, Inc. have had knowledge of the '346 patent and their alleged direct and indirect infringement since October 31, 2017.

130.   IBM has been damaged by the infringement of its '346 patent by Zillow and will continue to be damaged by such infringement.   IBM is entitled to recover from Zillow the damages sustained by IBM as a result of Zillow's wrongful acts.

131.   The infringement by Zillow of the '346 patent was, and continues to be, deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  In committing these acts of infringement, Zillow actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

132.   IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Zillow is enjoined therefrom by this Court.  In committing these acts of infringement, Zillow actually knew or should have known that their actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

## COUNT THREE
## INFRINGEMENT OF THE '183 PATENT

133.   IBM incorporates by reference paragraphs 1-132.

134.   IBM is the owner of all right, title and interest in the '183 patent.  The '183 patent was duly and properly issued by the USPTO on January 26, 2016.  The '183 patent was duly assigned to IBM.  A copy of the '183 patent is attached hereto as Exhibit 50.

135.   The '183 patent is valid and enforceable.

136.   In violation of 35 U.S.C. § 271, Zillow has infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '183 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported their website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the associated mobile applications, including the Zillow applications for mobile devices running on, for example, the Apple iOS and Google Android operating systems, including at least Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications. Zillow's infringement is continuing.

137.   Zillow Group "operates the largest portfolio of real estate and home-related brands on mobile and the web which focus on all stages of the home lifecycle: renting, buying, selling and financing. . . .  The Zillow Group portfolio of consumer brands includes Zillow . . . ."[49]  Zillow Group's "technology solutions" and actions related to such technology infringe, direct or control infringement, induce infringement, and/or contribute to the infringement through Zillow's website and through the mobile application instrumentalities.

138.   Zillow, Inc. owns and operates the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications on, for example, the iOS and Android operating systems. Zillow, Inc. provides online real estate listings and related services to consumers and local real estate agents through the website and mobile application instrumentalities.

139.   Zillow Group and Zillow, Inc. directly infringe one or more claims of the '183 patent through the Zillow website and the Zillow mobile applications, as described below.  Additionally, Zillow Group directs and controls the infringing behavior of its agent, Zillow, Inc., which Zillow Group operates and wholly owns.

140.   For example, as shown in Exhibit 51, the Zillow website and Zillow mobile applications infringe at least claim 1 of the '183 patent at least by:

a.   retrieving in real time, by a computer processor of a computing system, image data associated with a plurality of locations within a specified geographical area;

b.   comparing, by said computer processor, said image data to a plurality of stored image data, wherein said plurality of stored image data comprise baseline measurement values associated with an expected condition level of baseline locations within a baseline geographical area;

c.   calculating, by said computer processor based on results of said

---

[49] Ex. 4 (Zillow Group 2018 10-K) at 3.

comparing, condition score values associated with said plurality of locations, wherein said condition score values indicate real time condition values associated with said plurality of locations;

      d.    calculating, by said computer processor based on said condition score values, an overall condition score value associated with said specified geographical area; and

      e.    generating, by said computer processor, a map indicating said overall condition score value associated with said specified geographical area.

141. For another example, Zillow Group and Zillow, Inc. infringe at least claim 1 of the '183 patent through Zillow's website and mobile applications in a similar manner to that shown in Exhibit 51 at least when the properties are from, or involve, Zillow Group Media; when the properties are properties Zillow owns through Zillow Offers; and when the properties are, for example, properties from Promoted Communities for new constructions, properties managed by or associated with Premier Agent, and other properties promoted using Zillow's advertising services.



Ex. 44 (Zillow search in Riverside County, CA).

Ex. 45 (https://www.zillow.com/resources/new-construction/training/inline-community-preview/).

142.   For another example, Zillow Group and Zillow, Inc. infringe at least claim 1 of the '183 patent through the Premier Agent service in at least a similar manner to that shown in Ex. 51:



| ZIP | AVG HOME VALUE | EST. LEADS | EST. COST PER LEAD | EST. ROI 6 MONTHS | SHARE OF VOICE | MONTHLY BUDGET | |
|-----|----------------|------------|--------------------|--------------------|----------------|----------------|---|
| 98290 | $443K | 21.4 | $112 | 3.95x | 46.6% | $1,405 | ⋮ |
| 98125 | $558K | 15.3 | $204 | 2.74x | 67.9% | $3,109 | ⋮ |
| 98155 | $515K | 11.2 | $213 | 2.42x | 46.0% | $1,985 | ⋮ |
| 98275 | $531K | 7.0 | $114 | 2.57x | 55.5% | $1,445 | ⋮ |

Active ZIPS®    Total Budget: $7,943.50

Ex. 52 (https://www.zillow.com/agent-resources/training/manage-premier-agent-advertising/manage-your-advertising-on-zillow/).

Ex. 52 (https://www.zillow.com/agent-resources/training/manage-premier-agent-advertising/manage-your-advertising-on-zillow/).

143.   The Zillow mobile applications, including at least the Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications, infringe at least claim 1 of the '183 patent in a similar manner as through the website.

144.   Alternatively, to the extent that any step of claim 1 of the '183 patent, including the "generating" step, is performed by a third party (in addition to and/or separate from Zillow's performance), such as a user, browser, or mobile operating system, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party. For example, each Zillow entity controls and/or directs the performance of the "generating" step by users, browsers, and mobile operating systems because it, for example, conditions receipt of a benefit, such as viewing accurate home and neighborhood value estimates, on the performance of the claimed steps, and establishes

1    the manner or timing of the performance by, for example, determining the method by
2    which the Zestimate and ZHVI is calculated and the map is generated using computer
3    code, such as HTML and JavaScript.  For another example, each Zillow entity controls
4    and/or directs the performance of the "generating" step by users, browsers, and mobile
5    operating systems because it profits from the performance by, for example, increasing
6    the number of users through updated home and neighborhood valuations, and each
7    Zillow entity has the right to stop or limit infringement, by, for example, removing this
8    image processing feature from the Zestimate feature or not providing computer code to
9    generate the map.

10          145.   Alternatively, to the extent any step of claim 1 of the '183 patent, including
11    the "generating" step, is performed by a third party (in addition to and/or separate from
12    Zillow's performance), such as a Content Delivery Network ("CDN") or other server,
13    including Amazon CloudFront, that performance is attributable to Zillow, Inc. and
14    Zillow Group at least because each Zillow entity has an agency and/or contractual
15    relationship with said third party and each Zillow entity controls and/or directs the
16    performance of said third party.  For example, each Zillow entity controls and/or directs
17    the performance of the "generating" step by CDNs because it, for example, conditions
18    receipt of a benefit, such as payment for services, on the performance of the claimed
19    steps, and establishes the manner or timing of the performance by, for example,
20    determining the method by which the Zestimate and ZHVI is calculated and the map is
21    generated using computer code, such as HTML and JavaScript.  For another example,
22    each Zillow entity controls and/or directs the performance of the "generating" step by
23    CDNs because it profits from the performance by, for example, increasing the number
24    of users through updated home and neighborhood valuations, and each Zillow entity
25    has the right to stop or limit infringement, by, for example, removing this image
26    processing feature from the Zestimate feature or not providing computer code to
27    generate the map.

28

146.   Zillow Group and Zillow, Inc. have had knowledge of the '183 patent and their alleged direct and indirect infringement since January 14, 2019.

147.   Zillow Group and Zillow, Inc. also indirectly infringe one or more claims of the '183 patent through the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications.  On information and belief, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) directly infringe the '183 patent through the use of the website and mobile applications to view at least real estate listings, Zestimates, and Zillow Home Value Indexes.  Zillow Group's Annual Report lists $1,333,554,000 of revenue from its website and mobile applications which "generate revenue from the sale of advertising services and our suite of marketing software and technology solutions."[50]  The revenue indicates that numerous end users and customers used Zillow's website and the associated mobile application in order to view real estate listings, Zestimates, and ZHVI values and thereby infringe the '183 patent.   In particular, to the extent Zillow does not perform the method steps, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) perform at least the method of calculating geographical condition score values recited by claim 1 of the '183 patent as shown in Exhibit 51.

148.   On information and belief, despite knowledge of the infringement of the '183 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to contribute to patent infringement by third parties by selling, offering to sell, and/or supplying components, and/or a material or apparatus for use in practicing the patented methods of the '183 patent by at least end users and consumers, as described in this section.

---

[50] Ex. 4 (Zillow Group 2018 10-K) at 3, 42.

149.   For example Zillow Group and Zillow Inc. provide computer code underlying the Zillow website and mobile applications, such as HTML, JavaScript, and image files, to customers and end users for use in infringing the '183 patent and such computer code does not have substantial non-infringing uses.  Such computer code is especially made and/or especially adapted for use in infringing the '183 patent and is not a staple article or commodity of commerce suitable for substantial non-infringing use.  The only substantial use of Zillow's computer code responses is for the claimed subject matter involving calculating geographical condition score values using image data as described in the '183 patent.

150.   Further, on information and belief, as a part of providing said computer code, Zillow Group and Zillow, Inc. enter into binding contracts with end users and customers to use Zillow's website and mobile applications, including in an infringing manner including by binding the users to a terms of use for the accused website and mobile applications.  On information and belief, Zillow Group and Zillow, Inc. receive valuable consideration from customers and end users located in this judicial district, including information provided by customers and end users, and/or information automatically collected from customers and end users.  When customers and end users in this judicial district use the accused website and/or mobile applications, Zillow Group and Zillow, Inc. collect information about the customers and end users, their devices, and their interaction with the accused website and the associated mobile application. Zillow Group and Zillow, Inc. work with service providers and advertising networks to track and manage cookie information and activities of customers and end users across different websites and devices.  Third parties use cookie information collected by Zillow Group and Zillow, Inc. to deliver advertisements to end users and customers based on their use of the accused website and mobile applications.  Zillow Group and Zillow, Inc.'s business is primarily funded through advertising.  The applications and website are especially made and/or especially adapted for use in infringing the Patents-in-Suit, at least as detailed in the individual Counts above, and are not a staple article or

commodity of commerce suitable for substantial non-infringing uses because, among other things, the components sent to users are uniquely designed only to access the infringing aspects of Zillow's website and mobile applications.

151.   On information and belief, despite their knowledge of the infringement of the '183 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to induce patent infringement by third parties, including at least the direct infringement by end users and customer, as described in this section.   Zillow has and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in a manner that infringes the '183 patent by advertising the website and mobile applications, providing customer support, and designing their website and mobile applications in such a way that the use of the website and mobile applications by an end user or customer infringes the '183 patent.

152.   For example, Zillow has encouraged and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in an infringing manner by providing customer support from their Irvine office in this district, and designing their website and mobile applications in such a way that the use of the website and mobile applications by an end user or customer infringes the Patents-in-Suit.   For example, "the technology developed in Zillow's Irvine office concerns . . . customer service," including, on information and belief, customer service in support to encourage and support customers and end users in their use of Zillow's website and the associated mobile applications in an infringing manner.[51]   For another example, https://zillow.zendesk.com/hc/en-us provides direction and support Zillow's website.   As of November 11, 2019, which is after the filing of the Complaint, Zillow continues to instructs its customers and end users in this judicial district to edit, add, or remove photos to influence Zestimate values in a manner that infringes at least claim 1

---

[51] Moch Decl. ¶ 11.

1  of the '183 patent.[52]   On information and belief, to the extent Zillow was not aware that

2  they were encouraging their customers and end users to infringe the '183 patent, its lack

3  of knowledge was based on being willfully blind to the possibility that their acts would

4  cause infringement.

5      153.   IBM has been damaged by the infringement of its '183 patent by Zillow

6  and will continue to be damaged by such infringement.  IBM is entitled to recover from

7  Zillow the damages sustained by IBM as a result of Zillow's wrongful acts.

8      154.   The infringement by Zillow of the '183 patent was, and continues to be,

9  deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and

10  to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  In

11  committing these acts of infringement, Zillow actually knew or should have known that

12  its actions constituted an unjustifiably high risk of infringement of a valid and

13  enforceable patent.

14      155.   IBM has suffered and continues to suffer irreparable harm, for which there

15  is no adequate remedy at law, and will continue to do so unless Zillow is enjoined

16  therefrom by this Court.  In committing these acts of infringement, Zillow actually knew

17  or should have known that its actions constituted an unjustifiably high risk of

18  infringement of a valid and enforceable patent.

19                          **COUNT FOUR**

20              **INFRINGEMENT OF THE '789 PATENT**

21      156.   IBM incorporates by reference paragraphs 1-155.

22      157.   IBM is the owner of all right, title and interest in the '789 patent.  The '789

23  patent was duly and properly issued by the USPTO on Oct. 13, 2015.  The '789 patent

24  was duly assigned to IBM.  A copy of the '789 patent is attached hereto as Exhibit 56.

25

26

27  [52] Ex. 53 (https://zillow.zendesk.com/hc/en-us/articles/203511930-How-do-I-add-or-remove-photos-of-my-home-); Ex. 54

28  (https://www.zillow.com/sellerlanding/edityourhome/); Ex. 55 (https://www.zillow.com/blog/zestimate-updates-230614/).

158.   The '789 patent is valid and enforceable.

159.   In violation of 35 U.S.C. § 271, Zillow has infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '789 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported its website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the associated mobile applications, including the Zillow applications for mobile devices running on, for example, the Apple iOS and Google Android operating systems, including at least Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications. Zillow's infringement is continuing.

160.   Zillow Group "operates the largest portfolio of real estate and home-related brands on mobile and the web which focus on all stages of the home lifecycle: renting, buying, selling and financing. . . .  The Zillow Group portfolio of consumer brands includes Zillow . . . ."[53]  Zillow Group's "technology solutions" and actions related to such technology infringe, direct or control infringement, induce infringement, and/or contribute to the infringement through Zillow's website and through the mobile application instrumentalities.

161.   Zillow, Inc. owns and operates the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications on, for example, the iOS and Android operating systems. Zillow, Inc. provides online real estate listings and related services to consumers and local real estate agents through the website and mobile application instrumentalities.

162.   Zillow Group and Zillow, Inc. directly infringe one or more claims of the '789 patent through the Zillow website and the Zillow mobile applications, as described below.  Additionally, Zillow Group directs and controls the infringing behavior of its agent, Zillow, Inc., which Zillow Group operates and wholly owns.

---

[53] Ex. 4 (Zillow Group 2018 10-K) at 3.

163.   For example, as shown in Exhibit 57 the Zillow website and Zillow mobile applications infringe at least claim 8 of the '789 patent at least by:

    a.   presenting a map display on a display device, wherein the map display comprises elements within a viewing area of the map display, wherein the elements comprise geospatial characteristics, wherein the elements comprise selected and unselected elements;

    b.   presenting a list display on the display device, wherein the list display comprises a customizable list comprising the elements from the map display;

    c.   receiving a user input drawing a selection area in the viewing area of the map display, wherein the selection area is a user determined shape, wherein the selection area is smaller than the viewing area of the map display, wherein the viewing area comprises elements that are visible within the map display and are outside the selection area;

    d.   selecting any unselected elements within the selection area in response to the user input drawing the selection area and deselecting any selected elements outside the selection area in response to the user input drawing the selection area; and

    e.   synchronizing the map display and the list display to concurrently update the selection and deselection of the elements according to the user input, the selection and deselection occurring on both the map display and the list display.

164.   For another example, Zillow Group and Zillow, Inc. infringe at least claim 8 of the '789 patent through Zillow's website and mobile applications in a similar manner to that shown in Ex. 57, at least when the shown properties are from, or involve, Zillow Group Media; when the shown properties are properties Zillow owns through Zillow Offers; and when the shown properties are, for example, properties from Promoted Communities for new constructions, properties managed by or associated with Premier Agent, and other properties promoted using Zillow's advertising services.

1
2
3
4
5
6
7
8
9
10
11



12   Ex. 44 (Zillow search in Riverside County, CA).

13
14
15
16
17
18



19
20
21
22
23
24   Ex. 45 (https://www.zillow.com/resources/new-construction/training/inline-

25   community-preview/).

26
27
28

1   165.   The Zillow mobile applications, including at least the Zillow Real Estate

2   & Rentals, Zillow Rentals, and Zillow Premier Agent applications, infringe at least

3   claim 8 of the '789 patent in a similar manner as through the website.

4   166.   Alternatively, to the extent that any step of claim 8 of the '789 patent,

5   including the "receiving a user input" step, is performed by a third party (in addition to

6   and/or separate from Zillow's performance), such as a user, browser, or mobile

7   operating system, that performance is attributable to Zillow, Inc. and Zillow Group at

8   least because each Zillow entity has an agency and/or contractual relationship with said

9   third party and each Zillow entity controls and/or directs the performance of said third

10  party.   For example, each Zillow entity controls and/or directs the performance of the

11  "receiving a user input" step by users, browsers, and mobile operating systems because

12  it, for example, conditions receipt of a benefit, such as selecting a specific map area to

13  search, on the performance of the claimed steps, and establishes the manner or timing

14  of the performance by, for example, providing and controlling the Draw Your Own

15  Search functionality.   For another example, each Zillow entity controls and/or directs

16  the performance of the "receiving a user input" step by users, browsers, and mobile

17  operating systems because it profits from the performance by, for example, increasing

18  use and user interactions from improved search functionality, and each Zillow entity

19  has the right to stop or limit infringement, by, for example, removing the Draw Your

20  Own Search feature.

21  167.   Alternatively, to the extent any step of claim 8 of the '789 patent, including

22  the "receiving a user input" step, is performed by a third party (in addition to and/or

23  separate from Zillow's performance), such as a Content Delivery Network ("CDN") or

24  other server, including Amazon CloudFront, that performance is attributable to Zillow,

25  Inc. and Zillow Group at least because each Zillow entity has an agency and/or

26  contractual relationship with said third party and each Zillow entity controls and/or

27  directs the performance of said third party.   For example, each Zillow entity controls

28  and/or directs the performance of the "receiving a user input" step by CDNs because it,

1    for example, conditions receipt of a benefit, such as payment for services, on the

2    performance of the claimed steps, and establishes the manner or timing of the

3    performance by, for example, providing and controlling the Draw Your Own Search

4    functionality.   For another example, each Zillow entity controls and/or directs the

5    performance of the "receiving a user input" step by CDNs because it profits from the

6    performance by, for example, increasing use and user interactions from improved

7    search functionality, and each Zillow entity has the right to stop or limit infringement,

8    by, for example, removing the Draw Your Own Search feature.

9        168.   Zillow Group and Zillow, Inc. have had knowledge of the '789 patent and

10   their alleged direct and indirect infringement since August 11, 2017.

11       169.   Zillow Group and Zillow, Inc. also indirectly infringe one or more claims

12   of the '789 patent through the Zillow website, including at least www.zillow.com,

13   www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile

14   applications.  On information and belief, in certain circumstances, client devices and

15   software (e.g., devices and software used by end users and customers of Zillow's

16   website and the associated mobile applications) directly infringe the '789 patent through

17   the use of the website and mobile applications to view at least real estate listings.  Zillow

18   Group's Annual Report lists $1,333,554,000 of revenue from its website and mobile

19   applications which "generate revenue from the sale of advertising services and our suite

20   of marketing software and technology solutions."[54]   The revenue indicates that

21   numerous end users and customers used Zillow's website and the associated mobile

22   application in order to view real estate listings and thereby infringe the '789 patent.  In

23   particular, to the extent Zillow does not perform the method steps, in certain

24   circumstances, client devices and software (e.g., devices and software used by end users

25   and customers of Zillow's website and the associated mobile applications) perform at

26

27

28

---

[54] Ex. 4 (Zillow Group 2018 10-K) at 3, 42.

1   least the method of coordinated geospatial and list-based mapping recited by claim 8 of

2   the '789 patent as shown in Exhibit 57.

3       170.   On information and belief, despite knowledge of the infringement of the

4   '789 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to

5   contribute to patent infringement by third parties by selling, offering to sell, and/or

6   supplying components, and/or a material or apparatus for use in practicing the patented

7   methods of the '789 patent by at least end users and consumers, as described in this

8   section.

9       171.   For example Zillow Group and Zillow Inc. provide computer code

10  underlying the Zillow website and mobile applications, such as HTML, JavaScript, and

11  image files, to customers and end users for use in infringing the '789 patent and such

12  computer code does not have substantial non-infringing uses.  Such computer code is

13  especially made and/or especially adapted for use in infringing the '789 patent and is

14  not a staple article or commodity of commerce suitable for substantial non-infringing

15  use.  The only substantial use of Zillow's computer code responses is for the claimed

16  subject matter involving coordinated geospatial and list-based mapping as described in

17  the '789 patent.

18      172.   Further, on information and belief, as a part of providing said computer

19  code, Zillow Group and Zillow, Inc. enter into binding contracts with end users and

20  customers to use Zillow's website and mobile applications, including in an infringing

21  manner including by binding the users to a terms of use for the accused website and

22  mobile applications.  On information and belief, Zillow Group and Zillow, Inc. receive

23  valuable consideration from customers and end users located in this judicial district,

24  including information provided by customers and end users, and/or information

25  automatically collected from customers and end users.  When customers and end users

26  in this judicial district use the accused website and/or mobile applications, Zillow Group

27  and Zillow, Inc. collect information about the customers and end users, their devices,

28  and their interaction with the accused website and the associated mobile applications.

1  Zillow Group and Zillow, Inc. work with service providers and advertising networks to
2  track and manage cookie information and activities of customers and end users across
3  different websites and devices.  Third parties use cookie information collected by Zillow
4  Group and Zillow, Inc. to deliver advertisements to end users and customers based on
5  their use of the accused website and mobile applications.  Zillow Group and Zillow,
6  Inc.'s business is primarily funded through advertising.  The applications and website
7  are especially made and/or especially adapted for use in infringing the Patents-in-Suit,
8  at least as detailed in the individual Counts above, and are not a staple article or
9  commodity of commerce suitable for substantial non-infringing uses because, among
10  other things, the components sent to users are uniquely designed only to access the
11  infringing aspects of Zillow's website and mobile applications.

12      173.  On information and belief, despite their knowledge of the infringement of
13  the '789 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to
14  induce patent infringement by third parties, including at least the direct infringement by
15  end users and customer, as described in this section.  Zillow has and continues to
16  encourage and instruct customers and end users to use Zillow's website and the
17  associated mobile applications in a manner that infringes the '789 patent by advertising
18  the website and mobile applications, providing customer support, and designing their
19  website and mobile applications in such a way that the use of the website and mobile
20  applications by an end user or customer infringes the '789 patent.

21      174.  For example, Zillow has encouraged and continues to encourage and
22  instruct customers and end users to use Zillow's website and the associated mobile
23  applications in an infringing manner by providing customer support from their Irvine
24  office in this district, and designing their website and mobile applications in such a way
25  that the use of the website and mobile applications by an end user or customer infringes
26  the Patents-in-Suit.  For example, "the technology developed in Zillow's Irvine office
27  concerns . . . customer service," including, on information and belief, customer service
28  in support to encourage and support customers and end users in their use of Zillow's

website and the associated mobile applications in an infringing manner.[55]  For another example, https://zillow.zendesk.com/hc/en-us provides direction and support for Zillow's website.  On information and belief, to the extent Zillow was not aware that they were encouraging their customers and end users to infringe the '789 patent, its lack of knowledge was based on being willfully blind to the possibility that their acts would cause infringement.

175.   IBM has been damaged by the infringement of its '789 patent by Zillow and will continue to be damaged by such infringement.  IBM is entitled to recover from Zillow the damages sustained by IBM as a result of Zillow's wrongful acts.

176.   The infringement by Zillow of the '789 patent was, and continues to be, deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  In committing these acts of infringement, Zillow actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

177.   IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Zillow is enjoined therefrom by this Court.  In committing these acts of infringement, Zillow actually knew or should have known that their actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

## COUNT FIVE

## INFRINGEMENT OF THE '389 PATENT

178.   IBM incorporates by reference paragraphs 1-177.

179.   IBM is the owner of all right, title and interest in the '389 patent.  The '389 patent was duly and properly issued by the USPTO on March 6, 2007.  The '389 patent was duly assigned to IBM.  A copy of the '389 patent is attached hereto as Exhibit 58.

---

[55] Moch Decl. ¶ 11.

1    180.   The '389 patent is valid and enforceable.

2    181.   In violation of 35 U.S.C. § 271, Zillow has infringed, contributed to the

3    infringement of, and/or induced others to infringe one or more of the claims of the '389

4    patent by having made, designed, offered for sale, sold, provided, used, maintained,

5    and/or   supported   their   website,   including   at   least   www.zillow.com,

6    www.zillowgroupmedia.com, and subdomains thereof, and the associated mobile

7    applications, including the Zillow applications for mobile devices running on, for

8    example, the Apple iOS and Google Android operating systems, including at least

9    Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications.

10   Zillow's infringement is continuing.

11   182.   Zillow Group "operates the largest portfolio of real estate and home-

12   related brands on mobile and the web which focus on all stages of the home lifecycle:

13   renting, buying, selling and financing. . . .  The Zillow Group portfolio of consumer

14   brands includes Zillow . . . ."[56]  Zillow Group's "technology solutions" and actions

15   related to such technology infringe, direct or control infringement, induce infringement,

16   and/or contribute to the infringement through the website and through the mobile

17   application instrumentalities.

18   183.   Zillow, Inc. owns and operates the Zillow website, including at least

19   www.zillow.com,  www.zillowgroupmedia.com,  and  subdomains  thereof,  and  the

20   Zillow mobile applications on, for example, the iOS and Android operating systems.

21   Zillow, Inc. provides online real estate listings and related services to consumers and

22   local real estate agents through the website and mobile application instrumentalities.

23   184.   Zillow Group and Zillow, Inc. directly infringe one or more claims of the

24   '389 patent through the Zillow website and the Zillow mobile applications, as described

25   below.  Additionally, Zillow Group directs and controls the infringing behavior of its

26   agent, Zillow, Inc., which Zillow Group operates and wholly owns.

27

28

---

[56] Ex. 4 (Zillow Group 2018 10-K) at 3.

185.   For example, as shown in Exhibit 59, the Zillow website and Zillow mobile applications infringe at least claim 1 of the '389 patent at least by:

        a.    selecting one or more objects to be displayed in a plurality of layers;

        b.    identifying a plurality of non-spatially distinguishable display attributes, wherein one or more of the non-spatially distinguishable display attributes corresponds to each of the layers;

        c.    matching each of the objects to one of the layers;

        d.    applying the non-spatially distinguishable display attributes corresponding to the layer for each of the matched objects;

        e.    determining a layer order for the plurality of layers, wherein the layer order determines a display emphasis corresponding to the objects from the plurality of objects in the corresponding layers; and

        f.    displaying the objects with the applied non-spatially distinguishable display attributes based upon the determination, wherein the objects in a first layer from the plurality of layers are visually distinguished from the objects in the other plurality of layers based upon the non-spatially distinguishable display attributes of the first layer.

186.   For another example, Zillow Group and Zillow, Inc. infringe at least claim 1 of the '389 patent through Zillow's website and mobile applications in a similar manner to that shown in Ex. 59 at least when the objects are properties from, or involving, Zillow Group Media; when the objects are properties Zillow owns through Zillow Offers; and when the objects are properties, for example, properties from Promoted Communities for new constructions, properties managed by or associated with Premier Agent, and other properties promoted using Zillow's advertising services.

1
2
3
4
5
6
7
8
9
10
11



12  Ex. 44 (Zillow search in Riverside County, CA).

13
14
15
16
17
18
19
20
21
22



23
24  Ex. 45 (https://www.zillow.com/resources/new-construction/training/inline-
25  community-preview/).
26
27
28

187.   For another example, Zillow Group and Zillow, Inc. infringe at least claim 1 of the '389 patent through the Premier Agent service in at least a similar manner to that shown in Ex. 59:



Ex. 60 (https://www.zillow.com/profile/Charles-Fabbella/).

188.   The Zillow mobile applications, including at least the Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications, infringe at least claim 1 of the '389 patent in a similar manner as through the website.

189.   Alternatively, to the extent that any step of claim 1 of the '389 patent, including the "selecting" or "determining" steps, is performed by a third party (in addition to and/or separate from Zillow's performance), such as a user, browser, or mobile operating system, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party.   For example, each Zillow entity controls and/or directs the performance of the "selecting" step by users, browsers, and mobile operating systems because it, for example, conditions receipt of a benefit, such as the ability for users to

search for and receive property listings on a map on Zillow's website and mobile applications, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining what type of properties are to be returned in a search.  For another example, each Zillow entity controls and/or directs the performance of the "selecting" step by users, browsers, and mobile operating systems because it profits from the performance by, for example, increasing use and user interactions from improved search functionality, and each Zillow entity has the right to stop or limit infringement, by, for example, not sending search results requested by the user in this manner.

190.   Alternatively, to the extent any step of claim 1 of the '389 patent, including the "selecting" or "determining" steps, is performed by a third party (in addition to and/or separate from Zillow's performance), such as a Content Delivery Network ("CDN") or other server, including Amazon CloudFront, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party.  For example, each Zillow entity controls and/or directs the performance of the "selecting" step by CDNs because it, for example, conditions receipt of a benefit, such as payment for services, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining what type of properties are to be returned in a search.   For another example, each Zillow entity controls and/or directs the performance of the "selecting" step by CDNs because it profits from the performance by, for example, increasing use and user interactions from improved search functionality, and each Zillow entity has the right to stop or limit infringement, by, for example, not sending search results requested by the user in this manner.

191.   Zillow Group and Zillow, Inc. have had knowledge of the '389 patent and their alleged direct and indirect infringement since January 14, 2019.

192.   Zillow Group and Zillow, Inc. also indirectly infringe one or more claims of the '389 patent through the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications.  On information and belief, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) directly infringe the '389 patent through the use of the website and mobile applications to view at least real estate listings.  Zillow Group's Annual Report lists $1,333,554,000 of revenue from its website and mobile applications which "generate revenue from the sale of advertising services and our suite of marketing software and technology solutions."[57]   The revenue indicates that numerous end users and customers used Zillow's website and the associated mobile applications in order to view real estate listings and thereby infringe the '389 patent.  In particular, to the extent Zillow does not perform the method steps, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) perform at least the method of displaying layered data recited by claim 1 of the '389 patent as shown in Exhibit 59.

193.   On information and belief, despite knowledge of the infringement of the '389 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to contribute to patent infringement by third parties by selling, offering to sell, and/or supplying components, and/or a material or apparatus for use in practicing the patented methods of the '389 patent by at least end users and consumers, as described in this section.

194.  For example Zillow Group and Zillow Inc. provide computer code underlying the Zillow website and mobile applications, such as HTML, JavaScript, and image files, to customers and end users for use in infringing the '389 patent and such

---

[57] Ex. 4 (Zillow Group 2018 10-K) at 3, 42.

1   computer code does not have substantial non-infringing uses.  Such computer code is

2   especially made and/or especially adapted for use in infringing the '389 patent and is

3   not a staple article or commodity of commerce suitable for substantial non-infringing

4   use.  The only substantial use of Zillow's computer code responses is for the claimed

5   subject matter involving displaying layered data as described in the '389 patent.

6       195.  Further, on information and belief, as a part of providing said computer

7   code, Zillow Group and Zillow, Inc. enter into binding contracts with end users and

8   customers to use Zillow's website and mobile applications, including in an infringing

9   manner including by binding the users to a terms of use for the accused website and

10  mobile applications.  On information and belief, Zillow Group and Zillow, Inc. receive

11  valuable consideration from customers and end users located in this judicial district,

12  including information provided by customers and end users, and/or information

13  automatically collected from customers and end users.  When customers and end users

14  in this judicial district use the accused website and/or mobile applications, Zillow Group

15  and Zillow, Inc. collect information about the customers and end users, their devices,

16  and their interaction with the accused website and the associated mobile applications.

17  Zillow Group and Zillow, Inc. work with service providers and advertising networks to

18  track and manage cookie information and activities of customers and end users across

19  different websites and devices.  Third parties use cookie information collected by Zillow

20  Group and Zillow, Inc. to deliver advertisements to end users and customers based on

21  their use of the accused website and mobile applications.  Zillow Group and Zillow,

22  Inc.'s business is primarily funded through advertising.  The applications and website

23  are especially made and/or especially adapted for use in infringing the Patents-in-Suit,

24  at least as detailed in the individual Counts above, and are not a staple article or

25  commodity of commerce suitable for substantial non-infringing uses because, among

26  other things, the components sent to users are uniquely designed only to access the

27  infringing aspects of Zillow's website and mobile applications.

28

196.   On information and belief, despite their knowledge of the infringement of the '389 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to induce patent infringement by third parties, including at least the direct infringement by end users and customer, as described in this section.  Zillow has and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in a manner that infringes the '389 patent by advertising the website and mobile applications, providing customer support, and designing their website and mobile applications in such a way that the use of the website and mobile applications by an end user or customer infringes the '389 patent.

197.   For example, Zillow has encouraged and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in an infringing manner by providing customer support from their Irvine office in this district, and designing their website and mobile applications in such a way that the use of the website and mobile applications by an end user or customer infringes the Patents-in-Suit.  For example, "the technology developed in Zillow's Irvine office concerns . . . customer service," including, on information and belief, customer service in support to encourage and support customers and end users in their use of Zillow's website and the associated mobile applications in an infringing manner.[58]  For another example, https://zillow.zendesk.com/hc/en-us provides direction and support for Zillow's website.  On information and belief, to the extent Zillow was not aware that they were encouraging their customers and end users to infringe the '389 patent, its lack of knowledge was based on being willfully blind to the possibility that their acts would cause infringement.

198.   IBM has been damaged by the infringement of its '389 patent by Zillow and will continue to be damaged by such infringement.  IBM is entitled to recover from Zillow the damages sustained by IBM as a result of Zillow's wrongful acts.

---

[58] Moch Decl. ¶ 11.

199.   The infringement by Zillow of the '389 patent was, and continues to be, deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  In committing these acts of infringement, Zillow actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

200.   IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Zillow is enjoined therefrom by this Court.  In committing these acts of infringement, Zillow actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

**COUNT SIX**

**INFRINGEMENT OF THE '443 PATENT**

201.   IBM incorporates by reference paragraphs 1-200.

202.   IBM is the owner of all right, title and interest in the '443 patent.  The '443 patent was duly and properly issued by the USPTO on July 11, 2006.  The '443 patent was duly assigned to IBM.  A copy of the '443 patent is attached hereto as Exhibit 61.

203.   The '443 patent is valid and enforceable.

204.   In violation of 35 U.S.C. § 271, Zillow has infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '443 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported their website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the associated mobile applications, including the Zillow applications for mobile devices running on, for example, the Apple iOS and Google Android operating systems, including at least Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications. Zillow's infringement is continuing.

205.  Zillow Group "operates the largest portfolio of real estate and home-related brands on mobile and the web which focus on all stages of the home lifecycle: renting, buying, selling and financing. . . .  The Zillow Group portfolio of consumer brands includes Zillow . . . ."[59]  Zillow Group's "technology solutions" and actions related to such technology infringe, direct or control infringement, induce infringement, and/or contribute to the infringement through the website and through the mobile application instrumentalities.

206.  Zillow, Inc. owns and operates the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications on, for example, the iOS and Android operating systems. Zillow, Inc. provides online real estate listings and related services to consumers and local real estate agents through the website and mobile application instrumentalities.

207.  Zillow Group and Zillow, Inc. directly infringe one or more claims of the '443 patent through the Zillow website and the Zillow mobile applications, as described below.  Additionally, Zillow Group directs and controls the infringing behavior of its agent, Zillow, Inc., which Zillow Group operates and wholly owns.

208.  For example, as shown in Exhibit 62, the Zillow website and Zillow mobile applications infringe at least claim 1 of the '443 patent at least by:

a. identifying at least one search result item from a search result of said Internet search by said user;

b. searching for said at least one associated advertisement within said repository using said at least one search result item;

c. identifying said at least one associated advertisement from said repository having at least one word that matches said at least one search result item; and

d. correlating said at least one associated advertisement with said at least one search result item.

---

[59] Ex. 4 (Zillow Group 2018 10-K) at 3.

1   209.   For another example, Zillow Group and Zillow, Inc. infringe at least claim

2   1 of the '443 patent through Zillow's website and mobile applications in a similar

3   manner to that shown in Ex. 62 at least when the advertising is from, or involves, Zillow

4   Group Media; when the advertising is for properties Zillow owns through Zillow Offers;

5   and when the advertising is for other advertised properties, such as Promoted

6   Communities for new constructions, properties managed by or associated with Premier

7   Agent, and other properties promoted using Zillow's advertising services.

8

9

10

11

12

13

14

15

16

17

18

19



20   Ex. 44 (Zillow search in Riverside County, CA).

21

22

23

24

25

26

27

28



Ex. 45 (https://www.zillow.com/resources/new-construction/training/inline-community-preview/).

210.   The Zillow mobile applications, including at least the Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications, infringe at least claim 1 of the '443 patent in a similar manner as through the website.

211.   Alternatively, to the extent that any step of claim 1 of the '443 patent, including the "identifying" step, is performed by a third party (in addition to and/or separate from Zillow's performance), such as a user, browser, or mobile operating system, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party. For example, each Zillow entity controls and/or directs the performance of the "identifying" step by users, browsers, and mobile operating systems because it, for example, conditions receipt of a benefit, such as receiving personalized advertisements, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining which advertisements are associated with which search result items.  For another example, each Zillow entity controls and/or

1  directs the performance of the "identifying" step by users, browsers, and mobile
2  operating systems because it profits from the performance by, for example, increasing
3  use and user interactions from improved targeting of advertisements, and each Zillow
4  entity has the right to stop or limit infringement, by, for example, removing this feature
5  from the Zillow website and applications.

6      212.  Alternatively, to the extent any step of claim 1 of the '443 patent, including
7  the "identifying" step, is performed by a third party (in addition to and/or separate from
8  Zillow's performance), such as a Content Delivery Network ("CDN") or other server,
9  including Amazon CloudFront, that performance is attributable to Zillow, Inc. and
10  Zillow Group at least because each Zillow entity has an agency and/or contractual
11  relationship with said third party and each Zillow entity controls and/or directs the
12  performance of said third party.  For example, each Zillow entity controls and/or directs
13  the performance of the "identifying" step by CDNs because it, for example, conditions
14  receipt of a benefit, such as payment for services, on the performance of the claimed
15  steps, and establishes the manner or timing of the performance by, for example,
16  determining which advertisements are associated with which search result items.  For
17  another example, each Zillow entity controls and/or directs the performance of the
18  "identifying" step by CDNs because it profits from the performance by, for example,
19  increasing use and user interactions from improved targeting of advertisements, and
20  each Zillow entity has the right to stop or limit infringement, by, for example, removing
21  this feature from the Zillow website and applications.

22      213.  Zillow Group and Zillow, Inc. have had knowledge of the '443 patent and
23  its alleged direct and indirect infringement since August 26, 2019.

24      214.  Zillow Group and Zillow, Inc. also indirectly infringe one or more claims
25  of the '443 patent through the Zillow website, including at least www.zillow.com,
26  www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile
27  applications.  On information and belief, in certain circumstances, client devices and
28  software (e.g., devices and software used by end users and customers of Zillow's

website and the associated mobile applications) directly infringe the '443 patent through the use of the website and mobile applications to view at least real estate listings. Zillow Group's Annual Report lists $1,333,554,000 of revenue from its website and mobile applications which "generate revenue from the sale of advertising services and our suite of marketing software and technology solutions."[60]   The revenue indicates that numerous end users and customers used Zillow's website and the associated mobile applications in order to view real estate listings and thereby infringe the '443 patent.  In particular, to the extent Zillow does not perform the method steps, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) perform at least the method of targeting associated advertisements recited by claim 1 of the '443 patent as shown in Exhibit 62.

215.  On information and belief, despite knowledge of the infringement of the '443 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to contribute to patent infringement by third parties by selling, offering to sell, and/or supplying components, and/or a material or apparatus for use in practicing the patented methods of the '443 patent by at least end users and consumers, as described in this section.

216.  For example Zillow Group and Zillow Inc. provide computer code underlying the Zillow website and mobile applications, such as HTML, JavaScript, and image files, to customers and end users for use in infringing the '443 patent and such computer code does not have substantial non-infringing uses.  Such computer code is especially made and/or especially adapted for use in infringing the '443 patent and is not a staple article or commodity of commerce suitable for substantial non-infringing use.  The only substantial use of Zillow's computer code responses is for the claimed

---

[60] Ex. 4 (Zillow Group 2018 10-K) at 3, 42.

1 subject matter involving targeting associated advertisements as described in the '443

2 patent.

3     217.  Further, on information and belief, as a part of providing said computer

4 code, Zillow Group and Zillow, Inc. enter into binding contracts with end users and

5 customers to use Zillow's website and mobile applications, including in an infringing

6 manner including by binding the users to a terms of use for the accused website and

7 mobile applications. On information and belief, Zillow Group and Zillow, Inc. receive

8 valuable consideration from customers and end users located in this judicial district,

9 including information provided by customers and end users, and/or information

10 automatically collected from customers and end users. When customers and end users

11 in this judicial district use the accused website and/or mobile applications, Zillow Group

12 and Zillow, Inc. collect information about the customers and end users, their devices,

13 and their interaction with the accused website and the associated mobile applications.

14 Zillow Group and Zillow, Inc. work with service providers and advertising networks to

15 track and manage cookie information and activities of customers and end users across

16 different websites and devices. Third parties use cookie information collected by Zillow

17 Group and Zillow, Inc. to deliver advertisements to end users and customers based on

18 their use of the accused website and mobile applications. Zillow Group and Zillow,

19 Inc.'s business is primarily funded through advertising. The applications and website

20 are especially made and/or especially adapted for use in infringing the Patents-in-Suit,

21 at least as detailed in the individual Counts above, and are not a staple article or

22 commodity of commerce suitable for substantial non-infringing uses because, among

23 other things, the components sent to users are uniquely designed only to access the

24 infringing aspects of Zillow's website and mobile applications.

25     218.  On information and belief, despite their knowledge of the infringement of

26 the '443 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to

27 induce patent infringement by third parties, including at least the direct infringement by

28 end users and customer, as described in this section. Zillow has and continues to

1   encourage and instruct customers and end users to use Zillow's website and the
2   associated mobile applications in a manner that infringes the '443 patent by advertising
3   the website and mobile applications, providing customer support, and designing their
4   website and mobile applications in such a way that the use of the website and mobile
5   applications by an end user or customer infringes the '443 patent.

6       219.   For example, Zillow has encouraged and continues to encourage and
7   instruct customers and end users to use Zillow's website and the associated mobile
8   applications in an infringing manner by providing customer support from their Irvine
9   office in this district, and designing their website and mobile applications in such a way
10  that the use of the website and mobile applications by an end user or customer infringes
11  the Patents-in-Suit.  For example, "the technology developed in Zillow's Irvine office
12  concerns . . . customer service," including, on information and belief, customer service
13  in support to encourage and support customers and end users in their use of Zillow's
14  website and the associated mobile applications in an infringing manner.[61]  For another
15  example, https://zillow.zendesk.com/hc/en-us provides direction and support for
16  Zillow's website.  As of November 11, 2019, Zillow continues to instructs its customers
17  and end users to view related listings on the accused website without having to return
18  to the search page or select filters in a way that infringes at least claim 1 of the '443
19  patent.[62]  On information and belief, to the extent Zillow was not aware that they were
20  encouraging their customers and end users to infringe the '443 patent, its lack of
21  knowledge was based on being willfully blind to the possibility that their acts would
22  cause infringement.

23      220.   IBM has been damaged by the infringement of its '443 patent by Zillow
24  and will continue to be damaged by such infringement.  IBM is entitled to recover from
25  Zillow the damages sustained by IBM as a result of Zillow's wrongful acts.

26

27
    _____

28  [61] Moch Decl. ¶ 11.
    [62] Ex. 63 (https://www.zillow.com/tech/embedding-similar-home-recommendation/).

221.   The infringement by Zillow of the '443 patent was, and continues to be, deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  In committing these acts of infringement, Zillow actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

222.   IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Zillow is enjoined therefrom by this Court.  In committing these acts of infringement, Zillow actually knew or should have known that their actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

## COUNT SEVEN

## INFRINGEMENT OF THE '904 PATENT

223.   IBM incorporates by reference paragraphs 1-222.

224.   IBM is the owner of all right, title and interest in the '904 patent.  The '904 patent was duly and properly issued by the USPTO on Nov. 20, 2012.  The '904 patent was duly assigned to IBM.  A copy of the '904 patent is attached hereto as Exhibit 64.

225.   The '904 patent is valid and enforceable.

226.   In violation of 35 U.S.C. § 271, Zillow has infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '904 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported its website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the associated mobile applications, including the Zillow applications for mobile devices running on, for example, the Apple iOS and Google Android operating systems, including at least Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications. Zillow's infringement is continuing.

227.   Zillow Group "operates the largest portfolio of real estate and home-related brands on mobile and the web which focus on all stages of the home lifecycle: renting, buying, selling and financing. . . .  The Zillow Group portfolio of consumer brands includes Zillow . . . ."[63]  Zillow Group's "technology solutions" and actions related to such technology infringe, direct or control infringement, induce infringement, and/or contribute to the infringement through the website and through the mobile application instrumentalities.

228.   Zillow, Inc. owns and operates the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications on, for example, the iOS and Android operating systems. Zillow, Inc. provides online real estate listings and related services to consumers and local real estate agents through the website and mobile application instrumentalities.

229.   Zillow Group and Zillow, Inc. directly infringe one or more claims of the '904 patent through the Zillow website and the Zillow mobile applications, as described below.  Additionally, Zillow Group directs and controls the infringing behavior of its agent, Zillow, Inc., which Zillow Group operates and wholly owns.

230.   For example, as shown in Exhibit 65, the Zillow website and Zillow mobile applications infringe at least claim 1 of the '904 patent at least by:

a.      producing, by one or more computers, a promotion list for a promotion management campaign by:

b.      generating, by one or more computers, a promotion instance from a promotion template;

c.      receiving, by one or more computers executing marketing campaign software, a search query that includes one or more attributes of a promotion instance;

d.      searching one or more data repositories for promotion instances having attributes corresponding to the attributes specified in the search query;

---

[63] Ex. 4 (Zillow Group 2018 10-K) at 3.

1     e.    returning a list including one or more promotion instances having

2  the attributes corresponding to the attributes specified in the search query;

3     f.    receiving, by the one or more computers, a selection of one or more

4  promotion instances, from the returned list, to be included in the promotion list;

5     g.    assigning the selected promotion instances to the promotions list;

6  and

7     h.    storing the promotion list in an electronic medium.

8     231.  For another example, Zillow Group and Zillow, Inc. infringe at least claim

9  1 of the '904 patent through Zillow's website and mobile applications in a similar

10  manner to that shown in Ex. 65 at least when the advertising is from, or involves, Zillow

11  Group Media; when the advertising is for properties Zillow owns through Zillow Offers;

12  and when the advertising is for other advertised properties, such as Promoted

13  Communities for new constructions, properties managed by or associated with Premier

14  Agent, and other properties promoted using Zillow's advertising services.

15

16


27     Ex. 44 (Zillow search in Riverside County, CA).

28



Ex. 45 (https://www.zillow.com/resources/new-construction/training/inline-community-preview/).

### How it works

**AMPLIFIED LOCAL EXPOSURE**
Drive renters in preselected markets directly to your community's website or listing.

**PREMIUM PLACEMENT**
Customizable ad content appears in a prominent location within listing search results.

**CUSTOMIZABLE**
Highlight what matters to your community — including available floorplans, concessions and amenities.

**FLEXIBLE**
Choose between a low, medium or high number of impressions and a variety of available contract lengths.

Ex. 46 (https://www.zillow.com/marketing/rental-property-advertising/).

232.   For another example, Zillow Group and Zillow, Inc. infringe at least claim 1 of the '904 patent through the Zillow Group Media service in at least a similar manner to that shown in Ex. 65:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



Ex. 66 (https://www.zillowgroupmedia.com/wp-content/uploads/2019/10/Zillow-

Group-Native-Search-Ad.pdf).

21
22
23
24

233.   For another example, Zillow Group and Zillow, Inc. infringe at least claim

1 of the '904 patent through the Zillow Group Media service in at least a similar manner

to that shown in Ex. 65:

25
26
27
28

**Ad Products**

Reach coveted audiences by featuring your brand in native placements across Zillow Group brands and devices. Integrate your message into the user experience with ad products that are perfectly formatted for every device to achieve outstanding performance results.

Ex. 47 (https://www.zillowgroupmedia.com/native-ads/).

234.   The Zillow mobile applications, including at least the Zillow Real Estate & Rentals, Zillow Rentals, and Zillow Premier Agent applications, infringe at least claim 1 of the '904 patent in a similar manner as through the website.

235.   Alternatively, to the extent that any step of claim 1 of the '904 patent, including the "receiving" step, is performed by a third party (in addition to and/or separate from Zillow's performance), such as a user, browser, or mobile operating system, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party. For example, each Zillow entity controls and/or directs the performance of the "receiving" step by users, browsers, and mobile operating systems because it, for example, conditions receipt of a benefit, such as improved quality of search results, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining which search results will be returned to the user.  For another example, each Zillow entity controls and/or directs the performance of the "receiving" step by users, browsers, and mobile operating systems because it profits from the performance by, for example, increasing use and user interactions from improved search results, and each Zillow entity has the right to stop or limit infringement, by, for example, using a different method to return search results to a user.

236.   Alternatively, to the extent any step of claim 1 of the '904 patent, including the "receiving" step, is performed by a third party (in addition to and/or separate from Zillow's performance), such as a Content Delivery Network ("CDN") or other server, including Amazon CloudFront, that performance is attributable to Zillow, Inc. and Zillow Group at least because each Zillow entity has an agency and/or contractual relationship with said third party and each Zillow entity controls and/or directs the performance of said third party.  For example, each Zillow entity controls and/or directs the performance of the "receiving" step by CDNs because it, for example, conditions receipt of a benefit, such as payment for services, on the performance of the claimed steps, and establishes the manner or timing of the performance by, for example, determining which search results will be returned to the user.  For another example, each Zillow entity controls and/or directs the performance of the "receiving" step by CDNs because it profits from the performance by, for example, increasing use and user interactions from improved search results, and each Zillow entity has the right to stop or limit infringement, by, for example, using a different method to return search results to a user.

237.   Zillow Group and Zillow, Inc. have had knowledge of the '904 patent and its alleged direct and indirect infringement since August 26, 2019.

238.   Zillow Group and Zillow, Inc. also indirectly infringe one or more claims of the '904 patent through the Zillow website, including at least www.zillow.com, www.zillowgroupmedia.com, and subdomains thereof, and the Zillow mobile applications.  On information and belief, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) directly infringe the '904 patent through the use of the website and mobile applications to view at least real estate listings.  Zillow Group's Annual Report lists $1,333,554,000 of revenue from its website and mobile applications which "generate revenue from the sale of advertising services and our suite

of marketing software and technology solutions."[64]   The revenue indicates that numerous end users and customers used Zillow's website and the associated mobile applications in order to view real estate listings and thereby infringe the '904 patent.  In particular, to the extent Zillow does not perform the method steps, in certain circumstances, client devices and software (e.g., devices and software used by end users and customers of Zillow's website and the associated mobile applications) perform at least the method of producing a promotion list recited by claim 1 of the '904 patent as shown in Exhibit 65.

239.  On information and belief, despite knowledge of the infringement of the '904 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to contribute to patent infringement by third parties by selling, offering to sell, and/or supplying components, and/or a material or apparatus for use in practicing the patented methods of the '904 patent by at least end users and consumers, as described in this section.

240.  For example Zillow Group and Zillow Inc. provide computer code underlying the Zillow website and mobile applications, such as HTML, JavaScript, and image files, to customers and end users for use in infringing the '904 patent and such computer code does not have substantial non-infringing uses.  Such computer code is especially made and/or especially adapted for use in infringing the '904 patent and is not a staple article or commodity of commerce suitable for substantial non-infringing use.  The only substantial use of Zillow's computer code responses is for the claimed subject matter involving returning a promotion list as described in the '904 patent.

241.  Further, on information and belief, as a part of providing said computer code, Zillow Group and Zillow, Inc. enter into binding contracts with end users and customers to use Zillow's website and mobile applications, including in an infringing manner including by binding the users to a terms of use for the accused website and

[64] Ex. 4 (Zillow Group 2018 10-K) at 3, 42.

mobile applications.  On information and belief, Zillow Group and Zillow, Inc. receive valuable consideration from customers and end users located in this judicial district, including information provided by customers and end users, and/or information automatically collected from customers and end users.  When customers and end users in this judicial district use the accused website and/or mobile applications, Zillow Group and Zillow, Inc. collect information about the customers and end users, their devices, and their interaction with the accused website and the associated mobile applications. Zillow Group and Zillow, Inc. work with service providers and advertising networks to track and manage cookie information and activities of customers and end users across different websites and devices.  Third parties use cookie information collected by Zillow Group and Zillow, Inc. to deliver advertisements to end users and customers based on their use of the accused website and mobile applications.  Zillow Group and Zillow, Inc.'s business is primarily funded through advertising.  The applications and website are especially made and/or especially adapted for use in infringing the Patents-in-Suit, at least as detailed in the individual Counts above, and are not a staple article or commodity of commerce suitable for substantial non-infringing uses because, among other things, the components sent to users are uniquely designed only to access the infringing aspects of Zillow's website and mobile applications.

242.  On information and belief, despite their knowledge of the infringement of the '904 patent, Zillow Group and Zillow, Inc. have intended and continue to intend to induce patent infringement by third parties, including at least the direct infringement by end users and customer, as described in this section.  Zillow has and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in a manner that infringes the '904 patent by advertising the website and mobile applications, providing customer support, and designing their website and mobile applications in such a way that the use of the website and mobile applications by an end user or customer infringes the '904 patent.

243.  For example, Zillow has encouraged and continues to encourage and instruct customers and end users to use Zillow's website and the associated mobile applications in an infringing manner by providing customer support from their Irvine office in this district, and designing their website and mobile applications in such a way that the use of the website and mobile applications by an end user or customer infringes the Patents-in-Suit.  For example, "the technology developed in Zillow's Irvine office concerns . . . customer service," including, on information and belief, customer service in support to encourage and support customers and end users in their use of Zillow's website and the associated mobile applications in an infringing manner.[65]  For another example, https://zillow.zendesk.com/hc/en-us provides direction and support for Zillow's website.  On information and belief, to the extent Zillow was not aware that they were encouraging their customers and end users to infringe the '904 patent, its lack of knowledge was based on being willfully blind to the possibility that their acts would cause infringement.

244.  IBM has been damaged by the infringement of its '904 patent by Zillow and will continue to be damaged by such infringement.  IBM is entitled to recover from Zillow the damages sustained by IBM as a result of Zillow's wrongful acts.

245.  The infringement by Zillow of the '904 patent was, and continues to be, deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.  In committing these acts of infringement, Zillow actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent.

246.  IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Zillow is enjoined therefrom by this Court.  In committing these acts of infringement, Zillow actually knew

---

[65] Moch Decl. ¶ 11.

1  or should have known that their actions constituted an unjustifiably high risk of
2  infringement of a valid and enforceable patent.

3  **RELIEF REQUESTED**

4      Wherefore, IBM respectfully requests that this Court enter judgment against the
5  Defendants as follows:

6      A.    That the '849 patent has been and continues to be infringed by Defendants;

7      B.    That Defendants' infringement of the '849 patent has been willful;

8      C.    An injunction against further infringement of the '849 patent;

9      D.    That the '346 patent has been and continues to be infringed by Defendants;

10      E.    That Defendants' infringement of the '346 patent has been willful;

11      F.    An injunction against further infringement of the '346 patent;

12      G.    That the '183 patent has been and continues to be infringed by Defendants;

13      H.    That Defendants' infringement of the '183 patent has been willful;

14      I.    An injunction against further infringement of the '183 patent;

15      J.    That the '789 patent has been and continues to be infringed by Defendants;

16      K.    That Defendants' infringement of the '789 patent has been willful;

17      L.    An injunction against further infringement of the '789 patent;

18      M.    That the '389 patent has been and continues to be infringed by Defendants;

19      N.    That Defendants' infringement of the '389 patent has been willful;

20      O.    An injunction against further infringement of the '389 patent;

21      P.    That the '443 patent has been and continues to be infringed by Defendants;

22      Q.    That Defendants' infringement of the '443 patent has been willful;

23      R.    An injunction against further infringement of the '443 patent;

24      S.    That the '904 patent has been and continues to be infringed by Defendants;

25      T.    That Defendants' infringement of the '904 patent has been willful;

26      U.    An injunction against further infringement of the '904 patent;

27      V.    An award of damages adequate to compensate IBM for the patent
28  infringement that has occurred pre-verdict and for damages that occur post-verdict,

together with pre-judgment interest and costs;

W.     An award of all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

X.     That this is an exceptional case and an award to IBM of its costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285; and

**Y.**     Such other relief as this Court deems just and proper.

Dated:  December 2, 2019     By:     /Marc E. Hankin/
Marc E. Hankin (SBN 170505)
Anooj Patel (SBN 300297)
HANKIN PATENT LAW, APC

*Of Counsel:*

John M. Desmarais (SBN 320875)
Karim Z. Oussayef (admitted *pro hac vice*)
Brian D. Matty (admitted *pro hac vice*)
Michael Matulewicz-Crowley (admitted *pro hac vice*)
DESMARAIS LLP

*Attorneys for Plaintiff International Business Machines Corporation*

## **DEMAND FOR JURY TRIAL**

IBM hereby demands trial by jury on all claims and issues so triable.

Dated:  December 2, 2019     By:     /Marc E. Hankin/
Marc E. Hankin (SBN 170505)
Anooj Patel (SBN 300297)
HANKIN PATENT LAW, APC

*Of Counsel:*

John M. Desmarais (SBN 320875)
Karim Z. Oussayef (admitted *pro hac vice*)
Brian D. Matty (admitted *pro hac vice*)
Michael Matulewicz-Crowley (admitted *pro hac vice*)
DESMARAIS LLP

*Attorneys for Plaintiff International Business Machines Corporation*